IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-93

No. 62PA21/63PA21

Filed 19 August 2022

ANDERSON CREEK PARTNERS, L.P.; ANDERSON CREEK INN, LLC; ANDERSON CREEK DEVELOPERS, LLC; FAIRWAY POINT, LLC; STONE CROSS, LLC d/b/a/ STONE CROSS ESTATES, LLC; RALPH HUFF HOLDINGS, LLC; WOODSHIRE PARTNERS, LLC; CRESTVIEW DEVELOPMENT, LLC; OAKMONT DEVELOPMENT PARTNERS, LLC; WELLCO CONTRACTORS, INC.; NORTH SOUTH PROPERTIES, LLC; W.S. WELLONS CORPORATION; ROLLING SPRINGS WATER COMPANY, INC; and STAFFORD LAND COMPANY, INC.

v.

COUNTY OF HARNETT


PF DEVELOPMENT GROUP, LLC

v.

COUNTY OF HARNETT


On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 275 N.C. App. 423 (2020), affirming an order entered on 26 November 2018 by Judge Michael J. O'Foghludha in Superior Court, Harnett County. Heard in the Supreme Court on 9 May 2022.

> *Scarbrough, Scarbrough & Trilling, PLLC, by John F. Scarbrough, James E. Scarbrough, and Madeline J. Trilling; James R. DeMay, for plaintiff-appellants.*
>
> *Fox Rothschild, LLP, by Kip David Nelson, Bradley M. Risinger, and Troy D. Shelton; and Christopher Appel, for defendant-appellee.*

*Erin E. Wilcox for amicus curiae Pacific Legal Foundation; and J. Michael Carpenter, for amicus curiae North Carolina Homebuilders Association.*

*F. Paul Calamita for amicus curiae North Carolina Water Quality Association and the National Association of Clean Water Agencies.*

ERVIN, Justice.

¶ 1    This appeal arises from a challenge to an ordinance adopted by defendant Harnett County that requires residential property developers to pay one-time water and sewer "capacity use" fees associated with each lot that they wish to develop as a precondition for obtaining the County's concurrence in the developer's application for the issuance of required water and sewer permits by the North Carolina Department of Environmental Quality. After the trial court granted the County's motion for judgment on the pleadings and dismissed all the claims asserted against the County by plaintiff PF Development Group and all but one of the claims asserted against the County by plaintiffs Anderson Creek Partners, L.P.; Anderson Creek, Inc., LLC; Anderson Creek Developers, LLC; Fairway Point, LLC; Stone Cross, LLC d/b/a Stone Cross Estates, LLC; Ralph Huff Holdings, LLC; Woodshire Partners, LLC; Crestview Development, LLC; Oakmont Development Partners, LLC; Wellco Contractors, Inc.; North South Properties, LLC; W.S. Wellons Corporation; Rolling Springs Water Company, Inc.; and Stafford Land Company, Inc., the Court of Appeals affirmed the trial court's decision. Our review of the Court of Appeals' decision requires us to determine whether the challenged "capacity use" fees are monetary land-use

exactions subject to constitutional review under the "essential nexus" and "rough proportionality" test articulated by the United States Supreme Court in *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987); *Dolan v. City of Tigard*, 512 U.S. 374 (1994); and *Koontz v. St. Johns River Water Management District*, 570 U.S. 595 (2013). After careful consideration of the parties' arguments in light of the record and the applicable law, we reverse the decision of the Court of Appeals and remand this case to Superior Court, Harnett County, for further proceedings not inconsistent with this opinion.

## I.  Factual Background

### A. Substantive Facts

On 20 October 1980, the Harnett County Board of Commissioners established the Buies Creek-Coats Water and Sewer District for the purpose of collecting and treating wastewater within the District's boundaries. On 23 July 1984, the County and the District entered an interlocal agreement pursuant to which the County agreed to operate the District's water and sewer systems. In resolving a legal challenge to the 1984 agreement, this Court held that counties had the authority to enter into interlocal cooperative agreements providing for the operation of a water and sewer system on behalf of a water and sewer district and to exercise all "rights, powers, and functions granted to water and sewer districts" in the course of doing so, *McNeill v. Harnett County*, 327 N.C. 552, 558–59 (1990) (citing N.C.G.S. § 153A-275

(1987)), with the powers that the County was authorized to exercise including the District's authority to "establish, revise, and collect rates, fees or other charges and penalties for the use of or the services furnished or to be furnished by any sanitary sewer system, water system or sanitary sewer and water system of the district[,]" *id.* (quoting N.C.G.S. § 162A-88 (1987)).

¶ 3         As of 1998, the County had established eight water and sewer districts for the purpose of managing water and wastewater services throughout its entire land area. In May 1998, the County and the districts entered a joint interlocal agreement which governed the manner in which the County operated each district's water and sewer systems. In the 1998 agreement, the County and the districts agreed that the districts would lease all of their real and personal property to the County, that the districts would transfer their financial and intangible assets to the County, that the County would assume most of the districts' liabilities, and that the County's Department of Public Utilities would "administer all operations and maintenance of" the water and sewer systems in each district. In addition, the County agreed to "[e]stablish and revise from time to time schedules of rates, fees, charges, and penalties for the use of or the water and sewer services furnished and to bill and collect same."

¶ 4         On 1 July 2016, acting in accordance with the 1998 Agreement, the County adopted an ordinance "for the purpose of establishing a schedule of rents, rates, fees,

charges and penalties for the use of and services furnished by water supply and distribution systems and sewer collections systems owned or operated by [the Department of Public Utilities]." Section 28(h) of the ordinance provides for the collection of "capacity use" fees for the purpose of "partially recover[ing] directly from new customers the costs of capacity of the utility system to serve them." More specifically, the ordinance provides that, for each new residential connection to a water or sewer system owned or operated by the County, the landowner must pay a one-time, non-negotiable fee of $1,000 for water service and $1,200 for sewer service, with the landowner being required to make the required payment prior to the County's concurrence in the landowner's application to the North Carolina Department of Environment and Natural Resources[1] for the issuance of the required water and/or sewer permits. According to the ordinance, "such charges are reasonable and necessary and result in a more equitable and economically efficient method of recovery of such costs to handle new growth and to serve new customers without placing an additional financial burden on existing customers solely through inordinate enhancement of water and sewer rates." Plaintiffs, who are engaged in the business of developing property in Harnett County, have paid the "capacity use"

---

[1] The Department of Environment and Natural Resources is now the Department of Environmental Quality.

fees required pursuant to the ordinance in the course of their development-related activities.

**B. Procedural History**

On 1 March 2017, the Anderson Creek plaintiffs filed a complaint in which they sought (1) a declaration that the County lacked the statutory authority to adopt and enforce the ordinance; (2) a declaration that the adoption and enforcement of the ordinance violated the Anderson Creek plaintiffs' rights to equal protection and substantive due process pursuant to Article I, Section 19 of the North Carolina Constitution; (3) a refund of all "capacity use" fees that had been paid to the County along with prejudgment interest; (4) an award of costs and attorney's fees; (5) an accounting for all "capacity use" fees that the Anderson Creek plaintiffs had paid to the County; and (6) the entry of an order allowing the Anderson Creek plaintiffs to deposit all future "capacity use" fees into an escrow account pending the entry of a final judgment in this case. The Anderson Creek plaintiffs claimed to have paid more than $25,000 in "capacity use" fees to the County pursuant to the ordinance.

On 19 May 2017, the County filed an amended answer denying the material allegations of the complaint, asserting numerous affirmative defenses, advancing counterclaims for breach of various agreements into which the individual Anderson Creek plaintiffs had entered with the County, and seeking the imposition of sanctions

against counsel for the Anderson Creek plaintiffs.[2]  On 16 March 2018, the Anderson Creek plaintiffs amended their complaint to add claims for breach of a 2018 settlement agreement between Anderson Creek Partners and the County and a declaration concerning the severability of a provision contained in that agreement addressing any future determination that the relevant "capacity use" fee payments were unlawful.  On 1 February 2018, the County filed an answer to the Anderson Creek plaintiffs' amended complaint and asserted an additional counterclaim seeking a declaration that the County had the authority to collect the challenged "capacity use" fees.[3]  On 12 February 2018, the County filed a motion seeking the entry of judgment in its favor with respect to all but one of the claims that had been asserted in the amended complaint and a motion to join necessary parties or, in the alternative, a motion for permissive joinder of parties.

On 19 July 2017, plaintiff PF Development Group, LLC, filed a complaint asserting six claims for relief against the County that were identical to those set out in the initial complaint filed by the Anderson Creek plaintiffs.  On 8 November 2018, the trial court consolidated the two cases, entered an order granting the County's motion for judgment on the pleadings with respect to all but one of the claims asserted

---

[2] The County's initial responsive pleading is not contained in the record on appeal.

[3] Although the County's answer to the amended complaint was filed before the Anderson Creek plaintiffs received authorization from the trial court to amend their complaint, no party has raised any issues about the timeliness of either the amended complaint or the amended answer or the parties' authority to file either document.

by the Anderson Creek plaintiffs and all of the claims asserted by PF Development and dismissing those claims with prejudice and concluded that its substantive decision had rendered the County's joinder motions moot. Plaintiffs noted an appeal to the Court of Appeals from the trial court's order.

**C. Court of Appeals Decision**

¶ 8        In seeking relief from the trial court's orders before the Court of Appeals, plaintiffs argued that the trial court had erred by entering judgment on the pleadings in favor of the County on the grounds that (1) the pleadings disclosed the existence of genuine issues of material fact; (2) the 1998 Agreement did not provide the County with the authority afforded to water and sewer districts by N.C.G.S. § 162A-88 to collect fees for water and sewer service "to be furnished;" and (3) plaintiffs had alleged a valid claim that the challenged "capacity use" fees were an "unconstitutional condition" for permit approval that failed to satisfy the "essential nexus" and "rough proportionality" requirements articulated in *Koontz*. In addition, plaintiffs contended that the trial court had erred by taking judicial notice of the 1984 and 1998 agreements without giving plaintiffs an adequate opportunity to challenge that decision.

¶ 9        In rejecting plaintiffs' challenges to the trial court's order, the Court of Appeals began by observing that "[j]udicial notice is appropriate where a fact is 'not subject to reasonable dispute in that it is either (1) generally known within the territorial

jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,' " *Anderson Creek Partners, L.P. v. Cnty. of Harnett*, 275 N.C. App. 423, 429 (2020) (quoting N.C.G.S. § 8C-1, Rule 201 (2017)), and that trial court decisions to judicially notice particular facts or items are subject to review on appeal only for abuse of discretion, *id.* at 429–30 (citing *Muteff v. Invacare Corp.*, 218 N.C. App. 558, 568 (2012)). After noting that "important public documents will be judicially noticed," *id.* at 429 (quoting *State ex rel Utils. Comm'n v. S. Bell Tel. & Tel. Co.*, 289 N.C. 286, 287 (1976)), the Court of Appeals determined that the 1984 and 1998 agreements "are public contracts between government entities" that are "subject to public review" that and "their existence is therefore 'not subject to reasonable dispute,' " *id.* at 430. In addition, the Court of Appeals reasoned that "[t]he agreements are important public documents germane to the resolution of this case" and that "some of the [plaintiffs] reference—or even incorporate—the 1998 Agreement in their pleadings." *Id.* As a result, the Court of Appeals concluded, the trial court did not abuse its discretion by judicially noticing the 1984 and 1998 agreements. *Id.*

¶ 10 Secondly, the Court of Appeal held that, while the relevant statutory provisions "authorized the County only to assess fees for the 'contemporaneous use' of its water and sewer systems, and otherwise 'clearly and unambiguously fail[ed] to give [the County] the essential prospective charging power needed to assess [the

fees,]" *id.* at 432 (alterations in original) (quoting *Quality Built Homes, Inc. v. Town of Carthage*, 369 N.C. 15, 22 (2016) (*Quality Built Homes I*)), the water and sewer districts did have the authority to collect fees for service to be provided in the future given that, unlike N.C.G.S. §§ 153A-277(a) or 160A-314(a), which govern the authority of counties and cities, respectively, to set rates for water and sewer service, N.C.G.S. § 162A-88 allowed water and sewer districts to set rates for "services furnished *or to be furnished*," *id.* at 433 (emphasis added).[4] In addition, the Court of Appeals observed that "local government entities may generally cooperate through interlocal agreements to carry out their purposes," *id.* (citing N.C.G.S. §§ 153A-275, 153A-278 (2015)), and determined that, in accordance with our decision in *McNeill*, "a county may contract with another local government entity to enable the county to exercise authority given to that entity," *id.* As a result, even though the County lacked the authority to charge fees for water and sewer service to be provided in the future, the water and sewer districts operating in Harnett County had the authority to do so and were free to enter into contracts with the County pursuant to which the County was entitled to exercise the authority that had been granted to the water and

---

[4] In 2017, the General Assembly amended N.C.G.S. §§ 153A-277(a) and 160A-314(a) to permit cities and counties to establish prospective fees like those at issue here. *See Public Water and Sewer System Development Fee Act*, S.L. 2017- 138, §§ 3, 4, 2017 N.C. Sess. Laws 996, 1000. However, the amended language did not become effective until 1 October 2017, with the General Assembly having specified that "[n]othing in this act provides retroactive authority for any system development fee, or any similar fee for water or sewer services to be furnished, collected by a local governmental unit prior to October 1, 2017." *Id.*, § 11, 2017 N.C. Sess. Laws at 1002.

sewer districts. *Id*. at 433–34. For that reason, the Court of Appeals concluded that "the only way the County could have had the authority to charge any prospective fees would be pursuant to an interlocal agreement through which the county could exercise authority held by the [d]istricts." *Id*. at 434.

¶ 11        Thirdly, the Court of Appeals held that, since "the 1998 Agreement granted the County the ability to exercise the [d]istricts' prospective fee-collecting authority," the pleadings "failed to present a material issue of fact regarding the County's authority to collect prospective fees." *Id*. at 436. In rejecting plaintiffs' contention that the record revealed the existence of a genuine issue of material fact concerning the extent to which the County either managed infrastructure owned by the districts or operated its own facilities, the Court of Appeals determined that this distinction was immaterial on the grounds that, "[r]egardless of whether the County is operating its own physical water and sewer infrastructure, the [d]istricts' infrastructure, infrastructure it acquired from the [d]istricts, or a combination thereof, the issue is whether the County had the authority to use any means to assess prospective fees for water and sewer services to be furnished in the future." *Id*. As a result, the Court of Appeals held that the trial court did not err in concluding that the 1998 agreement permitted the County to exercise the districts' fee-collecting authority "by any legal means." *Id*. at 437.

¶ 12    Finally, the Court of Appeals addressed plaintiffs' contention that the record revealed the existence of a genuine issue of material fact concerning the extent to which the challenged "capacity use" fees were subject to "unconstitutional conditions" analysis pursuant to *Koontz*. *Id*. The Court of Appeals noted that, in accordance with *Nollan* and *Dolan*, "the government is allowed to condition approval of land-use permits by requiring the landowner to mitigate the impact of his or her proposed use." *Anderson Creek Partners*, 275 N.C. App. at 438 (citing *Dolan*, 512 U.S. at 391; *Nollan*, 483 U.S. at 837). As part of this process, the Court of Appeals determined that "[t]he government may require that the landowner agree to a particular public use of the landowner's real property, as long as there is an 'essential nexus' and 'rough proportionality' between the public impact of the landowner's proposed developments and the government's requirements." *Id*. (citing *Nollan*, 438 U.S. at 837; *Dolan*, 512 U.S. at 391). According to the Court of Appeals, *Koontz* extended the "essential nexus" and "rough proportionality" test enunciated in *Nollan* and *Dolan* to encompass demands that a landowner make a monetary payment in exchange for permit approval "where there is a 'direct link between the government's demand and a specific parcel of property.'" *Id*. (quoting *Koontz*, 570 U.S. at 614).

¶ 13    In the Court of Appeals' view, the challenged fees "were categorized as impact fees and referred to as 'capacity use fees,' despite the County's requirement that the fees be paid prior to approval of a developer's permits." *Id*. at 439. After

acknowledging the Supreme Court's statement that the "unconstitutional conditions" doctrine "did not affect the ability of governments to impose property taxes, user fees, and similar laws and regulations that may impose financial burdens on landowners," citing *Koontz*, 570 U.S. at 615, the Court of Appeals noted that the Supreme Court had "otherwise provided little guidance on how courts should tread the fine line between unconstitutional exactions and constitutional, routine taxes and fees" and pointed out that "the application of the unconstitutional conditions doctrine to monetary exactions in North Carolina" was a question of first impression, *Anderson Creek Partners*, 275 N.C. App. at 439, 441. The Court of Appeals found the decisions from other jurisdictions upon which plaintiffs relied "regarding the thin line between unconstitutional exactions and constitutional user fees" to be unpersuasive given that they were "part of the pre-*Koontz* division of authority over whether a demand for money could give rise to an unconstitutional conditions claim under *Nollan/Dolan*—a [question] which *Koontz*," in the Court of Appeals' opinion, "settled in the affirmative." *Id.* at 442 (citing *Koontz*, 570 U.S. at 603). On the contrary, the Court of Appeals found *Dabbs v. Anne Arundel County*, 458 Md. 331 (2018), in which Maryland's highest court held that generally applicable fees do not implicate the "unconstitutional conditions" doctrine, to be persuasive. *Anderson Creek Partners*, 275 N.C. App. at 442.

¶ 14 As the Court of Appeals noted, *Dabbs* involved a challenge to impact fees that the defendant county had collected in connection with the development of real estate that were designed to facilitate improvements to the county's transportation and education infrastructure, *Dabbs*, 458 Md. at 336–38, with these fees having been "legislatively-imposed[,] predetermined, based on a specific monetary schedule, and applie[d] to any person wishing to develop property in the district," *id*. at 353. In rejecting arguments similar to those that plaintiffs have advanced in this case, the Maryland Court of Appeals concluded in *Dabbs* that the challenged fees were not subject to constitutional scrutiny under *Nollan* and *Dolan* because, "unlike *Koontz*, the [challenged ordinance] [did] not direct a [land]owner to make a conditional monetary payment to obtain approval of an application for a permit of any particular kind, nor [did] it impose the condition on a particularized or discretionary basis." *Id*. (citations omitted). On the contrary, the Maryland Court of Appeals held that the fee at issue in *Dabbs* "applied on a generalized district-wide basis" rather than having been established in the course of determining "whether an actual permit will issue to a payor individual with a property interest." *Id*. (citing *Koontz*, 570 U.S. at 628 (Kagan, J., dissenting) (suggesting that the Supreme Court should "approve the rule, adopted in several states, that *Nollan* and *Dolan* apply only to permitting fees that are imposed ad hoc, and not to fees that are generally applicable")).

¶ 15        The Court of Appeals concluded that *Dabbs* was "in harmony with" both *Koontz* and the definition of an "exaction" articulated in *Franklin Road Properties v. City of Raleigh*, 94 N.C. App. 731, 736 (1989) (defining an "exaction" as a fee assessed "in lieu of compliance with dedication or improvement provisions" or "reflecting [developers'] respective prorated shares of the cost of providing new roads, utility systems, parks, and similar facilities serving the entire area") (citation omitted).  In the Court of Appeals' view, "[t]his definition did not include fees assessed on a generally applicable basis in a static quantity indifferent to the particular developers' prorated share of any resulting impact."  *Anderson Creek Partners*, 275 N.C. App. at 443.  As a result, the Court of Appeals held that

> impact and user fees which are imposed by a municipality to mitigate the impact of a developer's use of property, which are generally imposed upon all developers of real property located within that municipality's geographic jurisdiction, and which are consistently imposed in a uniform, predetermined amount without regard to the actual impact of the developers' project do not invoke scrutiny as an unconstitutional condition under *Nollan/Dolan* nor under North Carolina precedent.

*Id*.  In view of the fact that the "capacity use" fees at issue in this case "are predetermined, set out in the [ordinance], and non-negotiable" and "are not assessed on an *ad hoc* basis or dependent upon the landowner's particular project," the Court of Appeals concluded that they did not come within the ambit of the approach adopted in *Koontz*.  *Id*.  In other words, the Court of Appeals held that, even though the

challenged fees "are assessed in conjunction with the landowners' intent to make use of real property located within the County's jurisdiction," they differ from the type of fee that is subject to the "unconstitutional conditions" doctrine because, "unlike the conditions imposed in *Koontz*, the County does not view a landowner's proposed project and then make a demand based upon that specific parcel of real property." *Id.*

¶ 16        The Court of Appeals noted that *Dabbs* could be distinguished from this case on the grounds that the challenged water and sewer "capacity use" fee was "assessed *prior* to the County's grant of building permits, thus making [it] a condition of approval," and that *Dabbs* "expressly [rested], in part, on the fact that the fees at issue were *not* 'a conditional monetary payment to obtain approval of an application for a permit of any particular kind[.]' " *Id.* at 444 (quoting *Dabbs*, 458 Md. at 353) (emphasis in original). According to the Court of Appeals, "this distinction" "speaks directly to the type of coercive harms that the United States Supreme Court sought to prevent in *Koontz*," that is, "to prevent the government from leveraging its legitimate interest in mitigating harms by imposing '[e]xtortionate demands' which may 'pressure [a] [land]owner into voluntarily giving up property for which the Fifth Amendment would otherwise require just compensation.' " *Id.* (quoting *Koontz*, 570 U.S. at 605–06). In the Court of Appeals' view, this "distinction [was not] material in this case" because, regardless of "whether the [f]ees were to be paid prior to or after [plaintiffs] began their projects, the fees were predetermined and are uniformly

applied—not levied against [plaintiffs] on an *ad hoc* basis—and thus do not suggest any intent by the County to bend the will or twist the arm of [plaintiffs]." *Id.* As a result, the Court of Appeals held that plaintiffs had "failed to present a constitutional takings claim under current federal and state unconstitutional conditions jurisprudence as a matter of law." *Id.* This Court allowed plaintiffs' discretionary review petitions for the purpose of examining "[w]hether the 'essential nexus' and 'rough proportionality' test under the application of the doctrine of unconstitutional conditions to land-use exactions applies to generally applicable legislative impact fees" and "[w]hether the pleadings demonstrate a genuine issue of material fact as to whether the County's 'capacity use' fees, as applied to [p]laintiffs, ha[ve] an 'essential nexus' and 'rough proportionality' to the impact of [p]laintiff's developments on the County's water and sewer systems."

## II.  Analysis

### A. Standard of Review

The purpose of a motion for judgment on the pleadings pursuant to N.C.G.S. § 1A-1, Rule 12(c), "is to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit," with the entry of judgment on the pleadings being appropriate when "all the material allegations of fact are admitted in the pleadings and only questions of law remain." *Ragsdale v. Kennedy*, 286 N.C. 130, 137 (1974). In deciding whether to grant or deny a motion for judgment on the pleadings,

"[t]he trial court is required to view the facts and permissible inferences in the light most favorable to the nonmoving party," with "[a]ll well pleaded factual allegations in the nonmoving party's pleadings [being] taken as true and all contravening assertions in the movant's pleadings [being] taken as false." *Id.* "A party seeking judgment on the pleadings must show that the complaint fails to allege facts sufficient to state a cause of action or admits facts which constitute a complete legal bar thereto." *DiCesare v. Charlotte-Mecklenburg Hosp. Auth.*, 376 N.C. 63, 70 (2020) (cleaned up). We review a trial court's ruling granting or denying a motion for judgment on the pleadings using a de novo standard of review. *Id.* (citing *Old Republic Nat'l Title Ins. Co. v. Hartford Fire Ins. Co.*, 369 N.C. 500, 507 (2017)).

**B. The Unconstitutional Conditions Doctrine and Land-Use Exactions**

¶ 18        According to the "unconstitutional conditions" doctrine, "the government may not deny a benefit to a person because he [or she] exercises a constitutional right," *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983) (citing *Perry v. Sinderman*, 408 U.S. 593, 597 (1972)), which "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up," *Koontz*, 570 U.S. at 604. *Nollan* and *Dolan* "involve a special application" of the "unconstitutional conditions" doctrine "that protects the Fifth Amendment right to just compensation for property the government takes when owners apply for land-use permits." *Id.* Those cases recognize that, in instances involving "land-use

exactions," applicants for land use permits "are especially vulnerable to the type of coercion that the unconstitutional doctrine prohibits because the government often has broad discretion to deny a permit that is worth far more than property it would like to take," thereby creating a situation in which the government can "pressure an owner into voluntarily giving up property for which the Fifth Amendment would otherwise require just compensation." *Id.* at 604–05 (citing *Dolan*, 512 U.S. at 385; *Nollan*, 483 U.S. at 831).  On the other hand, *Nollan* and *Dolan* acknowledge that "many proposed land uses threaten to impose costs on the public that dedications of property can offset" and that "[i]nsisting that landowners internalize the negative externalities of their conduct is a hallmark of responsible land-use policy," with the Supreme Court having "long sustained such regulations against constitutional attack." *Id.* at 605 (citing *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926)).  As a result, *Nollan* and *Dolan* sought to accommodate these two concerns by allowing the government to condition approval of a land-use permit application on the landowner's agreement to dedicate a portion of his or her property to public use if there is an "essential nexus" and "rough proportionality" between the property that the government demands and the social costs of the landowner's proposed use for the remaining property, *Dolan*, 512 U.S. at 391; *Nollan*, 483 U.S. at 837, with this arrangement serving to "enable permitting authorities to insist that [permit] applicants bear the full costs of their proposals while still forbidding the government

from engaging in 'out-and-out . . . extortion' that would thwart the Fifth Amendment right to just compensation." *Koontz*, 570 U.S. at 606 (quoting *Dolan*, 512 U.S. at 387).

¶ 19       In *Koontz*, the Supreme Court extended the requirement to show an "essential nexus" and "rough proportionality" to cases involving "monetary exactions." *Id*. at 612. *Koontz* arose when a Florida resident sought to develop a portion of his property by raising its elevation to make the land suitable for building, grading the land at the southern edge of the building site down to the height of nearby high-voltage electrical lines, and installing a dry-bed pond to retain and release stormwater runoff from the proposed building and associated parking lot. *Id*. at 601. According to Florida law, the plaintiff first had to obtain a Wetland Resources Management permit, which "require[d] that permit applicants wishing to build on wetlands offset the resulting environmental damage by creating, enhancing, and preserving wetlands elsewhere." *Id*. In an attempt to satisfy this requirement, the plaintiff offered to provide a conservation easement on the southern 11-acre portion of his 14.9-acre property that would have precluded the possibility of future development. *Id*. In response, the St. Johns River Water Management District, the entity responsible for reviewing the plaintiff's permit application, proposed that the plaintiff limit the size of his development to a single acre and make the remaining 13.9 acres subject to a conservation easement. *Id*. In the alternative, the District offered to accept the

plaintiff's original proposal if he agreed to pay for improvements to property that the District already owned at another location. *Id.* at 602.

¶ 20 In addressing the plaintiff's claim that the District's alternative proposal resulted in a taking of property without just compensation, the Florida Supreme Court concluded that the *Nollan/Dolan* rule was inapplicable "because the subject of the exaction at issue [in the case] was money rather than a more tangible interest in real property." *Id.* at 612 (citing *St. Johns River Water Mgmt. Dist. v. Koontz*, 77 So.3d 1220, 1230 (Fla. 2011)). On further review, however, the United States Supreme Court observed that, "if we accepted this argument[,] it would be very easy for land-use permitting officials to evade the limitations of *Nollan* and *Dolan*" by "simply giv[ing] the [land]owner a choice of either surrendering an easement or making a payment equal to the easement's value." *Id.* In the Court's view, since "[s]uch so-called 'in lieu of' fees' " were "functionally equivalent to other types of land use exactions," they "must satisfy the nexus and rough proportionality requirements of *Nollan* and *Dolan.*" *Id.*

¶ 21 On the other hand, the Supreme Court also stated that "[i]t is beyond dispute that taxes and user fees are not takings," so that its decision had no bearing upon "the ability of governments to impose property taxes, user fees, and similar laws and regulations that may impose financial burdens on property owners." *Id.* at 615 (cleaned up). According to the Supreme Court, "[t]he fulcrum this case turns on is

the direct link between the government's demand and a specific parcel of property"

and therefore *Koontz*

> implicate[d] the central concern of *Nollan* and *Dolan*: the
> risk that the government may use its substantial power
> and discretion in land-use permitting to pursue
> governmental ends that lack an essential nexus and rough
> proportionality to the effects of the proposed new use of the
> specific property at issue, thereby diminishing without
> justification the value of the property.

*Id.* at 614. As a result, the Supreme Court held that "the government's demand for

property from a land-use permit applicant must satisfy the requirements of *Nollan*

and *Dolan* even when the government denies the permit and even when its demand

is for money." *Id.* at 619.

¶ 22    Neither party has cited, nor has our own research discovered, any North

Carolina precedent other than the Court of Appeals' decision in this case that

addresses the applicability of the "unconstitutional conditions" doctrine to monetary

exactions since the Supreme Court decided *Koontz* in 2013. In *Batch v. Town of*

*Chapel Hill*, which was decided prior to *Koontz*, the plaintiff applied to the town for

the issuance of a permit authorizing the subdivision of a 20-acre tract of property

located within the town's extraterritorial jurisdiction into eleven lots. 92 N.C. App.

601, 603 (1989), *rev'd on other grounds*, 326 N.C. 1 (1990). Although the plaintiff

revised her application in response to concerns expressed by the town's planning staff,

the planning staff ultimately recommended that the plaintiff's application be denied

because, among other things, the plaintiff had "failed to indicate on her subdivision plat an intent to dedicate to the Town of Chapel Hill a right-of-way through her property for the proposed Laurel Hill Parkway." *Id.* The Chapel Hill Town Council adopted the planning staff's recommendation on the grounds that the plaintiff's application was "not consistent with the orderly growth and development of the [t]own" as contemplated in the town's land use plan and "[did] not have streets which coordinate with existing and planned streets and highways as required" by town ordinance. *Id.* at 603–04. In seeking relief from the town's decision, the plaintiff asserted that it (1) violated her due process rights; (2) resulted in an unconstitutional taking of her property; (3) deprived her of the equal protection of the laws; (4) worked a temporary taking of her property; (5) violated her civil rights under 42 U.S.C. § 1983; and (6) involved an inverse condemnation of her property actionable pursuant to N.C.G.S. § 40A-51. *Id.* at 604.

¶ 23          In seeking to defend an order granting summary judgment in her favor on appeal, the plaintiff argued that "the conditions imposed by the town were unlawful exactions of defendant's property and [are subject to] the Fifth Amendment regulatory taking doctrine enunciated in [*Nollan*]." *Id.* at 612. The Court of Appeals agreed with the plaintiff's contention, holding that the requirement that the plaintiff dedicate a right-of-way for the future Laurel Hill Parkway was "an exaction with Fifth Amendment implications" and defining an "exaction" as

> a condition of development permission that requires a
> public facility or improvement to be provided at the
> developer's expense. Most exactions fall into one of four
> categories: (1) requirements that land be dedicated for
> street rights-of-way, parks, or utility easements and the
> like; (2) requirements that improvements be constructed or
> installed on land so dedicated; (3) requirements that fees
> be paid in lieu of compliance with dedication or
> improvement provisions; and (4) *requirements that
> developers pay "impact" or "facility" fees reflecting their
> respective prorated shares of the cost of providing new
> roads, utility systems, parks, and similar facilities serving
> the entire area.*

*Id.* at 613 (emphasis added) (quoting Richard D. Ducker, *"Taking" Found for Beach
Access Dedication Requirement*, 30 Local Gov't Law Bulletin 2, Institute of
Government (1987)). After acknowledging that "[n]ot all exactions are constitutional
takings" and that determining which exactions were and were not constitutionally
permissible required identification of "when an individual property owner should pay
for community improvement and when that cost fairly lies with the 'public as a
whole,'" *id.* at 614–15 (quoting *Nollan*, 483 U.S. at 836 n.4), the Court of Appeals,
relying, in part, upon statutory authority delegated to municipalities by the General
Assembly, adopted a "rational nexus test" for the purpose of "guid[ing] the trial court
in evaluating when an exaction is tantamount to a taking," stating that,

> [t]o determine whether an exaction amounts to an
> unconstitutional taking, the court shall: (1) identify the
> condition imposed; (2) identify the regulation which caused
> the condition to be imposed; (3) [and] determine whether
> the regulation substantially advances a legitimate state
> interest. If the regulation substantially advances a

> legitimate state interest, the court shall then determine (4) whether the condition imposed advances that interest; *and* (5) whether the condition imposed is proportionally related to the impact of the development.

*Id*. at 621 (emphasis in original). After conducting what it believed to be the required analysis, the Court of Appeals held that the challenged condition failed to satisfy the final component of this "rational nexus" test because it was "not proportionately related to the impact of the development" and there was "no commensurate benefit to the subdivision for its forfeit of land to preserve the Parkway Plan." *Id*. at 622.[5]

¶ 24    Shortly after deciding *Batch*, the Court of Appeals applied the "rational nexus test" in evaluating the validity of a determination made by the City of Raleigh in enforcing its setback ordinance by refusing to approve the plaintiff's application for a building permit unless the plaintiff agreed to dedicate a portion of its property for use in widening a portion of the adjacent public street and to pay for the necessary paving work. *Franklin Road Properties*, 94 N.C App. at 736–37. Although the "rational nexus" test and definition of "exaction" utilized in these cases antedated the Supreme

---

[5] Although this Court subsequently reversed the Court of Appeals' decision in *Batch*, our decision rested upon a determination that the town had the authority to deny the plaintiff's permit application on the grounds that the proposed subdivision plan failed to comply and coordinate with the town's transportation plan, as required by a municipal ordinance. *Batch*, 326 N.C. at 12–13. In addition, we determined that the trial court erred by making its own findings of fact concerning the Town's justification for denying the plaintiff's permit application because those findings were not supported by the evidence in the record. *Id*. at 12. In light of these determinations, we concluded that we did not need to consider the lawfulness of the other reasons upon which the Town relied in denying the plaintiff's permit application, expressly declining "to review or decide any of plaintiff's constitutional claims or other issues arising in her complaint." *Id*. at 14.

Court's decisions in *Dolan* and *Koontz*, the Court of Appeals appropriately recognized in this case that the "rational nexus" test enunciated in *Batch* closely resembles the "essential nexus" and "rough proportionality" requirements set out in *Nollan* and *Dolan* and that *Franklin Road* anticipated, at least to some extent, the Supreme Court's application of those criteria to "monetary exactions" in *Koontz*. *Anderson Creek Partners*, 275 N.C. App. at 441–42. As a result, we find *Batch* and *Franklin Road* helpful in resolving the issues that are before us in this case.

**C. Classification of the "Capacity Use Fee"**

A crucial, albeit non-dispositive, determination that we must make at the beginning of our analysis is the manner in which the "capacity use" fees at issue in this case should be classified. The County, on the one hand, contends that the relevant payments are nothing more than the sort of "user fees" that we discussed in *Homebuilders Association of Charlotte v. City of Charlotte*, 336 N.C. 37 (1994), and that the United States Supreme Court discussed in decisions such as *United States v. Sperry Corporation*, 493 U.S. 52, 53 (1989). Plaintiffs, on the other hand, assert that the "capacity use" fees at issue in this case are "impact fees" that result in an "exaction" as the Court of Appeals defined that term in *Batch*. 92 N.C. App. 613. In our view, plaintiffs have the better of this disagreement.

As we clearly determined in *Quality Built Homes I*, "impact fees," which are designed to "offset [the] costs to expand [water and sewer] system[s] to accommodate

development," are not the same as "user fees," which are associated with the contemporaneous provision of water and sewer service. 369 N.C. at 17, 21. According to a well-recognized treatise concerning North Carolina land use law, impact fees are "assessments upon the owners or developers of land made by local governments to recoup the capital costs for services needed to serve new development" and are collected as an alternative to the use of general tax revenues "to finance the new roads, water, sewers, fire stations, public safety services, parks, schools, and other public facilities that must be provided to service new development." David C. Owens, *Land Use Law in North Carolina*, p. 110 (3d ed. 2020). "User fees," on the other hand, are "charge[s] assessed for the use of a particular item or facility," *User Fee*, Black's Law Dictionary (11th ed. 2019), include fees intended to cover the cost of regulatory services provided by the relevant unit of government, *Homebuilders Ass'n of Charlotte*, 336 N.C. at 42, and are generally upheld in the event that they are reasonable, *id*. at 46. *See also Sperry Corp.*, 493 U.S. at 62 (holding that a fee deducted from money recovered by American claimants appearing before the Iran-United States Claims Tribunal that was intended to recoup the costs of administering the tribunal was a reasonable user fee rather than an unconstitutional taking).

¶ 27        Although the County labeled the payments at issue in this case as "capacity use" fees and has denied that they constituted "impact fees," the Court of Appeals correctly treated these payments as "impact fees." *See Anderson Creek Partners*, 275

N.C. App. at 439. As the County admits in its brief, the challenged "capacity use" fees are intended to "cover the cost of expanding the infrastructure of the water and sewer system to accommodate the new development," a description that falls squarely within the definition of an "impact fee" discussed above.[6] The fees at issue in this case are not water and sewer service fees, paid by customers at a fixed rate in accordance with their monthly metered water and sewer usage for the purpose of paying for the service that they used. In addition, the challenged fees are not "tap-on fees" paid at the time that individual lots are connected to the County's water and sewer system.[7] Instead, the fees at issue in this case are intended to provide the County with a contribution toward the cost of expanding its water and sewer infrastructure to account for the additional customers that will be added as a result of the developer's development. Thus, the "capacity use" fees at issue in this case, which are not intended to cover the cost of any service that is currently being provided to the person paying them "at the time of actual use," *Quality Built Homes, I,* 369 N.C. at 21, are clearly different from those at issue in *Homebuilders Association of Charlotte*, which were specifically intended to "cover the costs of regulatory services provided by the city," including the labor costs associated with reviewing permit

---

[6] As an aside, we note that the amicus curiae brief filed by the North Carolina Water Quality Association and the National Association of Clean Water Agencies in support of the County consistently refers to the challenged "capacity use" fees as "impact fees."

[7] The parties dispute whether plaintiffs have been charged separate "tap-on fees" in addition to the "capacity use fees," but resolution of that factual question is not germane to the issue that is before us in this case.

applications, 336 N.C. at 45. As a result, for all of these reasons, we hold that the challenged "capacity use fees" are properly categorized as impact fees rather than "user fees," a determination that renders much of the authority upon which the County relies inapplicable.

In addition, we conclude that the challenged "capacity use" fees are "exactions" as the Court of Appeals used that term in *Batch* and as contemplated by the Supreme Court in *Koontz*. As we have already noted, the definition of "exaction" set out in *Batch* encompasses both "requirements that *land* be dedicated for street rights-of-way, parks, or utility easements" and "requirements that developers *pay* 'impact' or 'facility' fees reflecting their respective prorated shares of the cost of providing new roads, utility systems, parks, and similar facilities serving the entire area." *Batch*, 92 N.C. App. at 613 (emphasis added). Although this Court has yet to specifically define the term "exaction" for purposes of North Carolina law, we have not rejected the definition that the Court of Appeals adopted in *Batch* and reiterated in both *Franklin Road Properties* and more recently in *TAC Stafford, LLC v. Town of Mooresville*, 2022-NCCOA-217, ¶ 34. The definition adopted by the Court of Appeals in *Batch* is consistent with that set out in Black's Law Dictionary, which defines a "land-use exaction" as "[a] requirement imposed by a local government that a developer dedicate real property for a public facility *or pay a fee* to mitigate the impacts of the project, as a condition of receiving a discretionary land-use approval."

*Land-Use Exaction*, Black's Law Dictionary (11th ed. 2019).  Finally, inclusion of a monetary payment within the definition of an "exaction" is, in our view, fully consistent with how that term was used in *Koontz*.  As a result, we adopt the definition of "exaction" set forth in the Court of Appeals' decision in *Batch* as our own and hold that the challenged "capacity use fees" constitute both "impact fees" and "monetary exactions."

**D. *Koontz* and Generally Applicable Fees**

In light of our determination that the challenged "capacity use" fees are "impact fees" and "monetary exactions," we must address the issue of whether those fees are subject to the "unconstitutional conditions" doctrine enunciated in *Nollan*, *Dolan*, and *Koontz*.  According to plaintiffs, any "impact fee" assessed by a local government should be treated as a "taking" subject to scrutiny under the "unconstitutional conditions" doctrine regardless of whether the relevant fee is assessed on an *ad hoc* basis or pursuant to a uniform, generally applicable assessment and regardless of the identity of the governmental entity engaging in the "taking."  In plaintiffs' view, the challenged "capacity use" fees implicate the same constitutional concerns that resulted in the adoption of the test delineated in *Nollan* and *Dolan*.  More specifically, plaintiffs argue that the ordinance requiring the payment of "capacity use" fees "does not reflect any supporting analysis or methodology that would ensure a sufficient 'nexus' or 'proportionality' to the 'impact'

of [p]laintiffs' developments on the County's water and sewer systems." *See American Water Works Association,* "M1 Manual, Principals of Water Rates, Fees, and Charges" p. 324 (7th ed. 2017) (identifying the minimum "key criteria" for use in determining whether a "rational nexus" exists as including system planning criteria financing criteria, and compliance with state or local laws)). After noting that the County doubled its capacity use fees between 2005 and the dates upon which they filed their complaints in 2017, plaintiffs emphasize that the ordinance requires developers to construct their own water and sewer infrastructure—in addition to paying the capacity use fees—which must then be deeded to the county, arguing that

> this contributed infrastructure for the County to use in the operation of its water and sewer system should reasonably be valued and factored into consideration of the true "impact" of [p]laintiffs' developments and whether the fees still serve to "mitigate" any impact of the development above the value of [p]laintiffs' infrastructure contributions, or if the fees instead lack the necessary "nexus" and "proportionality."

Moreover, plaintiffs point out that "the fact that the 1998 [a]greement between the County and the [water and sewer] districts provides that the impact fee revenue from the individual districts [is] commingled in the County's enterprise funds, without a separate 'equitable and pro-rata' accounting for each [d]istrict, violates 'nexus' and 'proportionality' principles." *See AWWA Manual* p. 343 (providing that a utility should ensure that impact fees are "managed and used for the facilities needed to provide service to new development in the utility's service area."). For all of these

reasons, plaintiffs contend that "impact fees inherently give rise to concerns involving coercion and fairness which the 'unconstitutional conditions' doctrine is meant to address."

¶ 30        Secondly, plaintiffs contend that, contrary to the conclusion reached by the Court of Appeals, the fact that the challenged "capacity use" fees are generally applicable and were enacted by a legislative body, rather than being assessed on an *ad hoc* basis by an administrative agency, does not exempt them from constitutional scrutiny. According to plaintiffs, "[t]here is nothing in *Nollan*, *Dolan*, or *Koontz* to support the view that the Supreme Court meant to limit application of the unconstitutional conditions doctrine to 'ad hoc' or 'administrative' decisions," with "each of the three decisions [having] involved exactions that were legislatively mandated," a conclusion that has led two state appellate courts to apply "a version of the *Nollan/Dolan* test" to impact fees. *See N. Ill. Home Builders Ass'n v. Cnty. of Du Page*, 165 Ill.2d 25 (1995); *Home Builders Ass'n of Dayton & the Miami Valley v. Beavercreek*, 89 Ohio St.3d 121 (2000)).

¶ 31        Plaintiffs assert that the Court of Appeals erred by relying upon *Dabbs* for a number of reasons. First, plaintiffs contend that, as the Court of Appeals recognized, *Dabbs* did not involve an application for the issuance of a permit conditioned on the payment of money to the issuing governmental entity. *See Anderson Creek Partners*, 275 N.C. App. at 444. Secondly, plaintiffs note that "[t]he Court of Appeals went so

far as to say that '[t]his distinction speaks directly to the types of coercive harms that the United States Supreme Court sought to prevent in *Koontz*' " before concluding that it "did not find the distinction 'material' for the sole reason that 'the fees were predetermined and are uniformly applied.' " *Id.* "In essence," plaintiffs argue, "the Court of Appeals recognized that the County's impact fees implicated the coercive harms which the unconstitutional conditions doctrine seeks to prevent, but the court was content that the legislative process would prevent those harms from materializing." Plaintiffs dispute the validity of this contention, arguing that "one of the reasons impact fees are popular with local government[s] is the lack of political opposition," given that future residents, who will bear the cost of the impact fees in the form of higher housing prices, do not currently vote. As a result, plaintiffs conclude that the challenged "capacity use" fees are "monetary exactions" subject to the "unconstitutional conditions" analysis enunciated in *Koontz*.

¶ 32        In seeking to persuade us to reach a different result, the County argues that "[t]he unconstitutional conditions doctrine does not apply to generally applicable fees" because "[a] fee charged by the government is not a 'taking' in the constitutional sense." In the County's view, "[t]he established rule in North Carolina is that a government's power 'to regulate an activity implies the power to impose a fee in an amount sufficient to cover the cost of regulation,' " such that "a local government acts reasonably 'by requiring that those who desire a particular service bear some of the

costs associated with the provision of that service,' " quoting *Homebuilders Ass'n of Charlotte*, 336 N.C. at 42, 45. According to the County, plaintiffs' reliance upon *Koontz* is misplaced because it "applies to 'in lieu of' fees" and plaintiffs "have not alleged any such fees here." The County argues that "[t]akings and fees 'are essentially different' " because, "when the government charges a fee or tax, it 'only exacts a contribution from individuals' that is used 'for the support of the government, or to meet some public expenditure authorized by it, for which they receive compensation in the protection which government affords, or in the benefits of the special expenditure,' " quoting *Mobile Cnty. v. Kimball*, 102 U.S. 691, 703 (1880). In the County's view, "[i]t was a 'well-settled' rule even before *Koontz* 'that the government may require fees for public use of certain services without causing a taking,' " quoting *Dudley v. United States*, 61 Fed. Cl. 685, 689 (2004)), with *Koontz* having done nothing to "alter this well-settled rule." In addition, the County contends that "[f]ees that apply the same to everyone do not target 'a specific parcel of real property' as required by *Koontz*, 570 U.S. at 614, citing several decisions from other jurisdictions that it describes as holding that *Koontz* does not apply to "generally applicable fees."[8]

---

[8] Among the decisions upon which the County relies in support of this assertion are *Santiago-Ramos v. Autoridad de Energia Electrica de P.R., AEE*, 834 F.3d 103, 107 (1st Cir. 2016) (concluding that the plaintiffs "cannot assert a valid property interest in funds paid for electricity" for purposes of *Koontz* because "[c]ustomers lose their interest in money paid to utilities companies for their service"); *United States v. King Mountain Tobacco Co.*, 131 F. Supp. 3d 1088, 1092–93 (E.D. Wash. 2015) (finding *Koontz* inapplicable to quarterly

Next, the County argues that "[t]he overwhelming weight of authority is that non-discretionary, generally applicable fees are not subject to the unconstitutional conditions doctrine." In support of this assertion, the County cites *Building Industry Association-Bay Area v. City of Oakland*, in which a federal district court held that an ordinance requiring developers to display or fund art as a condition of project approval did not implicate *Koontz*. *See* 289 F. Supp. 3d 1056, 1057 (N.D. Cal. 2018). According to the district court, *Koontz* did not hold that "generally applicable land-use regulations are subject to facial challenge under the exactions doctrine" and held, instead, "that the exactions doctrine applies to demands for money (not merely demands for encroachments on property)." *Id.*, 289 F. Supp. 3d at 1057–58. In

assessments collected from tobacco manufacturers by the Department of Agriculture), *aff'd* 745 F. App'x 700 (9th Cir. 2018); *Fitchburg Gas & Elec. Light Co. v. Dep't of Publ. Utils.*, 467 Mass. 768, 779 (2014) (rejecting an electric company's claim that an annual assessment for the benefit of the state's Storm Trust Fund constituted a per se taking, citing *Koontz* for the proposition that "[f]ederal courts have established that an obligation to pay money is not a per se taking where the obligation does not affect or operate on a specific, identified property interest."); *Page v. City of Wyandotte*, 2018 WL 6331339, at *6 (Mich. Ct. App. Dec. 4, 2018) (per curiam) (unpublished) (holding that charges for water and cable services provided by the city were user fees that did not result in a taking); *In re Buffets, LLC*, 979 F.3d 366, 381 (5th Cir. 2020) (holding that federal legislation increasing the quarterly fees applicable to bankruptcy filings was not unconstitutional because "[t]axes and user fees are not takings under the Fifth Amendment"); *Edmonson v. Fregmen*, 590 F. App'x 613, 615 (7th Cir. 2014) (unpublished) (determining that the imposition of a freeze on an indigent prisoner's trust account based upon a failure to pay court filing fees did not constitute an unconstitutional taking and was, instead, a "reasonable user fee" for "reimbursement of the cost of government services"); *Better Hous. for Long Beach v. Newsom*, 452 F. Supp. 3d 921, 934–35 (C.D. Cal. 2020) (rejecting an argument that *Koontz* "expanded the definition of *per se* takings to include all government-imposed financial obligations 'linked to a specific, identifiable piece of property' " and concluding that a state law requiring landlords to pay or waive one month's rent before terminating a residential tenancy under certain circumstances did not constitute a *per se* taking).

addition, the County cites *Douglass Properties II, LLC v. City of Olympia*, in which the Washington Court of Appeals held that conditioning the issuance of a building permit upon the payment of a generally applicable traffic impact fee did not implicate *Koontz* because, even though "*Koontz* expanded the scope of takings that require *Nollan/Dolan* scrutiny to include 'monetary exactions,' it did not expand that scope to include legislatively prescribed development fees like those at issue here." 16 Wash. App. 2d 158, 171 (2021). The distinctions made in these cases make sense, in the County's view, "because the 'sine qua non' for application of the *Nollan/Dolan/Koontz* analysis is the 'discretionary deployment of the police power in the imposition of land-use conditions in individual cases,' " quoting *Action Apartment Ass'n v. City of Santa Monica*, 82 Cal. Rptr. 3d 722, 732 (Cal. Ct. App. 2008)).[9] According to the County, "[w]hen a government imposes a generally

___

[9] In addition, the County directs our attention to *Tex. Manufactured Hous. Ass'n v. City of Nederland*, 101 F.3d 1095, 1105 (5th Cir. 1996) (declining to apply *Nollan* to a municipal zoning ordinance that prohibited placement of manufactured homes on any lot within the city outside a designated trailer park and observing that the plaintiff landowner had not been singled out for differential treatment like the landowner before the Court in *Nollan*); *Harris v. City of Wichita*, 862 F. Supp. 287, 294 (D. Kan. 1994) (declining to apply the *Dolan* "rough proportionality" test to zoning regulations prohibiting the use of property surrounding an Air Force base on the grounds that the regulations (1) "are land use restrictions and do not impose upon plaintiffs the obligation to deed portions of their land to the local government," (2) that the city's and county's decisions "were legislative rather than adjudicative in nature," and (3) the regulations affected all of the land surrounding the Air Force base, "not merely the individual parcels owned by plaintiffs"); *Krupp v. Breckenridge Sanitation Dist.*, 19 P.3d 687, 696–97 (Colo. 2001) (determining that *Nollan* and *Dolan* did not apply to a one-time "plant-improvement fee" that was intended to defray the cost of expanding the sanitation district's infrastructure despite the fact that the payment of the fee was a prerequisite for the issuance of a building permit on the grounds that the fee was a

applicable fee, it is not subject to the same test . . . even when the fees have some connection to property development."

¶ 34          The County contends that, "as in *Dabbs*, the County's water and sewer fees are 'predetermined, based on a specific monetary schedule,' and apply 'to any person wishing to develop property in the district,' " quoting *Dabbs*, 458 Md. at 353. As a result, the County asserts that "[f]ees that are 'imposed on a generally applicable basis are not subject to a rough proportionality or nexus analysis,' " quoting *Dabbs*,

---

"generally applicable service fee on all new development within the [d]istrict," no adjudication was involved, and the fee was "purely a monetary assessment rather than a dedication of real property for public use"); *Greater Atlanta Homebuilders Ass'n v. DeKalb Cnty.*, 277 Ga. 295, 297–98 (2003) (refusing to apply *Dolan* to a county tree preservation ordinance because it "involve[d] "a facial challenge to a generally applicable land-use regulation" that resulted from a "legislative determination" rather than "an adjudicative decision"); *Arcadia Dev. Corp. v. City of Bloomington*, 552 N.W. 2d 281, 286 (Minn. Ct. App. 1996) (concluding that the *Dolan* "rough proportionality" standard did not apply to a city ordinance requiring mobile home park owners to assist residents with relocation costs when the park closed on the grounds that a *Dolan* analysis is only required for "adjudicative determinations that condition approval of a proposed land use on a property transfer to the government"); *Home Builders Ass'n of N. Cal. v. City of Napa*, 108 Cal. Rptr. 2d 60, 65–66 (Cal. Ct. App. 2001) (declining to apply *Nollan* and *Dolan* to a city inclusionary zoning ordinance that required residential property developers to dedicate 10 percent of their developed land to affordable housing or, in the alterative, to pay an "in-lieu fee" on the grounds that the ordinance did not involve a "land use bargain between a governmental agency and a person who wants to develop his or her land" and was, instead, "economic legislation that is generally applicable to *all* development in [the] City") (emphasis in original); *Common Sense Alliance v. Growth Mgmt. Hearings Bd.*, 2015 WL 4730204, at *7 (Wash. Ct. App. Aug. 10, 2015) (unpublished) (rejecting a facial challenge to a county ordinance requiring that habitat buffers and tree protection zones be provided as a prerequisite for development approval within the relevant county on the grounds that "it appears that the courts have confined *Nollan/Dolan* analysis to land use decisions that condition approval of a specific project on a dedication of property to public use" and that "legislative determinations do not present the same risk of coercion as adjudicative decisions").

458 Md. at 353. In the same vein, the County denies that *Dabbs* is some sort of outlier, citing *San Remo Hotel L.P. v. City & County of San Francisco*, in which the Supreme Court of California held that the *Nollan/Dolan* test did not apply to "development fees that are generally applicable through legislative action because the heightened risk of the 'extortionate' use of the police power to exact unconstitutional conditions is not present." 27 Cal. 4th 643, 668 (2002) (cleaned up). As a result, the California Supreme Court held that, while "individualized development fees warrant a type of review akin to the conditional conveyances at issue in *Nollan* and *Dolan* . . . generally applicable fees warrant a more deferential type of review." *Id.* (cleaned up).

¶ 35 The County contends that the Court of Appeals "joined [the] overwhelming line of authority" by holding that *Koontz* did not apply to generally applicable legislative fees and that plaintiffs "have not cited a single case" in which a court held to the contrary. In the County's view, the cases cited by plaintiffs either did not involve a generally applicable fee or were decided based upon state law, rather than the federal constitution. In addition, the County argues that plaintiffs' argument is flawed because "[t]he Supreme Court has said that the rough proportionality test requires the government to 'make some sort of individualized determination,' [512 U.S. *Dolan* at 391] " but that "generally applicable fees, by their very nature, cannot contain an individualized determination" and indeed "are *more* fair because they lack the *ad hoc*,

discretionary nature that comes into play in the unconstitutional conditions doctrine." According to the County, generally applicable fees like those at issue in this case mitigate any concerns about the lack of transparency inherent in *ad hoc* exactions because "all landowners are aware of the fees in advance" and, "[i]f they choose to develop property in the County, they know what the cost will be."

¶ 36        Next, the County claims that plaintiffs erroneously contend that *Koontz* answered the question before the Court in this case on the theory that the issue of "whether the monetary assessment is made by a legislature or an administrator" is "a red herring." From the County's perspective, the "capacity use" fees at issue in this case "are not permissible because they are 'legislative;'" instead, the County contends that the challenged "capacity use" fees "are generally applicable, non-discretionary, and set in advance," with "the relevant line" between fees that do and do not implicate the "unconstitutional conditions" doctrine being "the *nature* of the government action, not the *branch* of government that is acting."

¶ 37        In the County's view, plaintiffs' argument should also fail because "they never identified a constitutional right that they were coerced into giving up." According to the County, "[t]here is no constitutional *right* to expand or use an existing water and sewer system" or "*not* to pay fees for government services." The County argues that "the water and sewer districts could 'command directly' that those who seek to expand the water and sewer systems pay for that expansion" and that "the water and sewer

fees would not 'otherwise require just compensation,' " citing *Koontz*, 570 U.S. at 604–05. In addition, the County asserts that, even though the "unconstitutional conditions" doctrine requires some sort of coercion by the government, plaintiffs have "not allege[d] coercion of any kind" and that "[r]equiring a developer to pay the same fee as everyone else for certain services can hardly be described as the 'out and out plan of extortion' targeted by the Supreme Court," quoting *Nollan*, 483 U.S. at 837. In other words, the County argues that, "[w]hen a payment is made in exchange for services offered by the government, the coercive element is missing," with the necessary coercion being absent in this case because "[plaintiffs] *wanted* to connect to the County's water and sewer system."

¶ 38        The County asserts that, while plaintiffs "could have used their properties for other purposes" or "sought to develop properties that used well water and septic tanks," they "elected to use their developments' connection to the County's water and sewer system as a way to increase density and market their homes to potential buyers." In the County's view, "[i]t was not an unlawful 'exaction' to ask [plaintiffs] to pay a standard fee for a service desired to improve the system that buttressed the sale prospects of their investment" given that new housing developments "place pressure on the water and sewer system and use portions of its capacity, which is

why each new development must offset some of the costs of improving and expanding the existing system."[10]

¶ 39    The County argues that the legislative process, rather than the courts, is the proper forum for consideration of plaintiffs' complaints on the theory that, "[i]f someone considers a generally applicable fee exorbitant, the fee is 'subject to the ordinary restraints of the democratic political process,' " because "[a] government 'that charged extortionate fees for all property development, unjustifiable by mitigation needs, would likely face widespread and well-financed opposition at the next election,' " quoting *San Remo Hotel*, 27 Cal. 4th at 671.  On the other hand, the County asserts that the judicial branch has no role in resolving the present dispute given that " 'the Takings Clause is meant to bar [the] [g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole' " and that "[j]ustice does not require that current residents pay for new costs created by incoming developments," quoting *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 542 (2005)).  According to the County, "[t]he 'capacity fees' at issue here are not 'cost recovery mechanisms,' but rather a means to 'equitably

---

[10] The County also argues in a footnote that "the coercive element is missing here because the County does not even control the permit at issue" and, instead, "merely conditions its *concurrence* on an application for a permit from the State—another governmental entity," with this fact serving to distinguish this case from *Nollan*, *Dolan*, and *Koontz*.  However, it is not clear from the record (nor does either party explain) whether the county's concurrence is *required* for the Department of Environmental Quality to approve the permits at issue.  Assuming that it is, the County's argument on this point is a meaningless distinction.

allocate to new users access to an existing system possessing an existing value' and a 'resource through which the utility purveyor may fund necessary capital improvements to the utility system,'" quoting *Landmark Dev., Inc. v. City of Roy*, 138 Wash.2d 561, 572 (1999), and that "[n]othing in the Constitution forbids 'permitting authorities [from] insist[ing] that applicants bear the full costs of their proposals' so long as they do not 'engag[e] in out-and-out extortion,'" quoting *Koontz*, 570 U.S. at 606.

¶ 40        Furthermore, the County contends that a decision to accept plaintiffs' argument would "subject every fee payment to a governmental entity to the *Nollan/Dolan/Koontz* analysis," a result that would be "unworkable" given that local governments have been permitted to charge fees for varied purposes, including using a city's parking facilities, opening graves in a cemetery, issuing permits for the operation of flea markets, granting licenses to engage in certain trades and occupations, registering golf carts, collecting garbage, accessing regional sports facilities, or using natural gas service. According to the County, "[e]xpanding the unconstitutional conditions doctrine to cover fees like these would cripple the ability of governments to tax, mandate fees, and levy other types of monetary payments that finance and make possible the services that governments provide." In addition, the County argues that "[i]t would be improper to allow [plaintiffs] to recoup the fees when they have presumably passed on those costs to others," resulting in a "windfall"

to them. *See* 36 Am. Jur. 3d *Proof of Facts* 417 (1996) (describing how developers pass costs associated with expanding infrastructure to ultimate purchasers in the form of higher prices for land and construction)).

¶ 41        In addition to their assertion that the challenged "capacity use" fees were subject to an "unconstitutional conditions" analysis pursuant to *Nollan*, *Dolan*, and *Koontz*, the County argues that plaintiffs have failed to allege sufficient facts to support a conclusion that the relevant fees did not satisfy the "essential nexus" and "rough proportionality" test given the County's legitimate interests in mitigating the impact of the cost of expanding existing infrastructure upon existing customers or the taxpayers.  According to the County, plaintiffs have alleged that "the water and sewer fees are imposed to connect new developments to the County's existing water and sewer systems" and have "acknowledge[d] the minimal amounts charged by the County."  More specifically, the County argues that plaintiffs have "alleged that the water and sewer fees are used for improvements to the water and sewer system," so as to satisfy the "essential nexus" requirement, and that plaintiffs have "alleged no facts to show that the [$2,200 in fees per residential property] was disproportionate to the effect of new development on the County's water and sewer system," with their legal conclusion to this effect not needing to "be credited at the Rule 12 stage."  *See Azure Dolphin, LLC v. Barton*, 371 N.C. 579, 599 (2018).  In addition, the County claims that showing "rough proportionality" does not require the use of a "formulaic

analysis" or "invite judges to pull out calculators or create spreadsheets to check a local government's math." On the contrary, the County contends that the inquiry involves the exercise of "common sense" and that the "capacity use" fees described in the complaint "meet that common-sense test and do not require a further factual inquiry."

¶ 42        A careful review of the record and the applicable law convinces us that the County's capacity use fees are subject to scrutiny under the "essential nexus" and "rough proportionality" tests articulated in *Nollan* and *Dolan*. In *Koontz*, the Supreme Court specifically held that "the government's demand for property from a land-use permit application must satisfy the requirements of *Nollan* and *Dolan* even when the government denies the permit and *even when its demand is for money*," 570 U.S. at 619 (emphasis added), with the Supreme Court's reference to "in lieu of" fees, rather than limiting the reach of the Supreme Court's decision, simply being a response to the Florida Supreme Court's conclusion that a governmental demand for money rather than an interference in tangible property rights did not constitute a taking. As the Supreme Court explained,

> if we accepted this argument it would be very easy for land-use permitting officials to evade the limitations in *Nollan* and *Dolan*. Because the government need only provide a permit applicant with one alternative that satisfies the nexus and rough proportionality standards, a permitting authority wishing to exact an easement could simply give the owner a choice of either surrendering an easement or making a payment equal to the easement's value. Such so-

called "in lieu of" fees are utterly commonplace and they are functionally equivalent to other types of land use exactions. . . . [W]e reject respondent's argument and hold that so-called 'monetary exactions' must satisfy the nexus and rough proportionality requirements of *Nollan* and *Dolan*.

*Id.* at 612. Based upon this logic, the Supreme Court held that "[t]he fulcrum this case turns on is the direct link between the government's demand and a specific parcel of real property," *id.* at 614, and that this link

> implicates the central concern of *Nollan* and *Dolan*: the risk that the government may use its substantial power and discretion in land-use permitting to pursue governmental ends that lack an essential nexus and rough proportionality to the effects of the proposed new use of the specific property at issue, thereby diminishing without justification the value of the property.

*Id.* As a result, we conclude that the "monetary exactions" with which *Koontz* was concerned were not limited to "in lieu of" fees and, instead, encompassed a broader range of governmental demands for the payment of money as a precondition for the approval of a land-use permit.[11]

¶ 43        In arguing that the principles enunciated in *Koontz* are inapplicable to the challenged "capacity use" fees on the grounds that "[f]ees that apply the same to everyone do not target 'a specific parcel of real property,' " *Koontz*, 570 U.S. at 614,

---

[11] The dissent in *Koontz* objected to the majority's decision, in part, because it extended the *Nollan/Dolan* test "to *all* monetary exactions" and limited the flexibility of local governments "to mitigate a new development's impact on the community[.]" *Koontz*, 570 U.S. at 629 (Kagan, J., dissenting) (emphasis in original). As plaintiffs point out, this statement recognizes that the Court's holding was not limited to "in lieu of" fees.

the County overlooks the fact that, by emphasizing the "specific parcel of real property" at issue in that case, the Supreme Court sought to distinguish *Koontz* from *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), in which a majority of the Supreme Court agreed that a federal statute that required a coal mining company to pay medical benefits for retired miners and their families did not constitute a taking for constitutional purposes because "the Takings Clause does not apply to government-imposed financial obligations that 'd[o] not operate upon or alter an identified property interest.' " *Koontz*, 570 U.S. at 613 (quoting *E. Enters.*, 524 U.S. at 540 (Kennedy, J., concurring in the judgment)). As the Supreme Court explained in *Koontz*, "[u]nlike the financial obligation in *Eastern Enterprises*, the demand for money at issue [in *Koontz*] did 'operate upon . . . an identified property interest' by directing the owner of a particular piece of property to make a monetary payment." *Id.* The same is true in this instance given that, by requiring the payment of the challenged "capacity use" fees as a precondition for its concurrence in applications for the issuance of the necessary water and sewer permits, the County is "directing the owner[s] of [each] particular piece of property to make a monetary payment," regardless of whether the same fee is applicable to all tracts of property and regardless of who owns the property. *Id.* In other words, the fee at issue in this case is, in fact, linked to a specific piece of property, in each case the specific parcel of land that has been proposed for development.

¶ 44        In addition, a careful examination of *Koontz* does not suggest that its holding is limited to "ad hoc" fees or exempts "non-discretionary, generally applicable fees," with this position having been advocated for in the dissenting opinion, rather than that of the majority. *See Koontz*, 570 U.S. at 628 (Kagan, J., dissenting) (suggesting that, in the future, "[t]he majority might, for example, approve the rule, adopted in several States, that *Nollan* and *Dolan* apply only to permitting fees that are imposed ad hoc and not to fees that are generally applicable" while acknowledging that the majority had not clearly resolved this issue). In the same vein, we are not persuaded that the non-discretionary, generally applicable nature of the "capacity use" fees at issue in this case eliminates or mitigates the "coercive pressure" concerns that motivated the Supreme Court in *Nollan*, *Dolan*, and *Koontz* given that, regardless of whether the fee is imposed on a single developer or on all developers, the County is exercising its "substantial power and discretion in land-use permitting" to exact money from those wishing to develop their land.[12] In the absence of any sort of limitation upon the County's authority to condition permit approval or concurrence in permit approval upon the payment of fees, the County would have the unfettered

---

[12] Despite the fact that the challenged "capacity use" fees are generally applicable, the County retains "discretion" in the sense that it may, at any time, decide to increase the amount of the impact fee, an authority it exercised when it doubled the fees between 2005 and 2017.

ability to increase the relevant fees substantially or to use the proceeds from the payment of the challenged fees for purposes unrelated to the development.

¶ 45        Similar concerns have been reflected in a number of prior decisions by this Court.  In *Lanvale Properties, LLC v. County of Cabarrus*, Cabarrus County had adopted an "adequate public facilities ordinance" that "effectively condition[ed] approval of new residential construction projects on developers paying a fee to subsidize new school construction to prevent overcrowding in the [c]ounty's public schools."  366 N.C. 142, 143 (2012).  In holding that the county lacked the authority to implement the ordinance through the exercise of its zoning power on the grounds that the ordinance did not "define the specific land uses that are permitted, or prohibited, within a particular zoning district," we noted that the relevant fees had increased by over 1,600 percent from 2003 to 2008 and concluded that the ordinance was nothing more than "a carefully crafted revenue generation mechanism that effectively establishes a 'pay-to-build' system for developers."  *Id*. at 160–61.  After rejecting the county's argument that the relevant fees constituted "voluntary mitigation payments" on the grounds that several members of the county commission had stated that approval of the required construction permits was conditioned on the county's receipt of payment, we opined that "[r]ecognizing that the [c]ounty's [ordinance] could generate significant amounts of revenue from a possibly unpopular group—residential developers—the [board of commissioners] substantially increased

its adequate public facilities fee over a five year period," thereby "illustrat[ing] the precise harm that may occur when [such ordinances] are adopted absent specific enabling legislation." *Id.* at 162.

¶ 46        Similarly, in *Quality Built Homes v. Town of Carthage*, the Town of Carthage operated a public water and sewer system for the benefit of its residents and, as part of that service, adopted two ordinances that required the assessment of "water and sewer impact fees" for new developments that were designed to cover the cost of expanding its existing water and sewer infrastructure to accommodate those developments. 371 N.C. 60, 61–62 (2018) (*Quality Built Homes II*). After this Court determined that the town lacked the authority to assess such fees in *Quality Built Homes I*, we remanded that case to the Court of Appeals "to address whether [the] plaintiffs' claims were barred by the applicable statute of limitations or the doctrine of estoppel by the acceptance of benefits." *Id.* at 62 (describing the Court's action in *Quality Built Homes I*, 369 N.C. at 19–22). In a second appeal arising from the Court of Appeals' decision on remand, this Court rejected the town's estoppel by benefits argument on the grounds that

> plaintiffs do not appear to have received any benefit from
> the payment of the challenged water and sewer impact fees
> that they would not have otherwise been entitled to
> receive. As we held in [*Virginia-Carolina Peanut Co. v.
> Atlantic Coast Line R. Co.*, 166 N.C. 62, 74–75 (1914)], in
> an instance in which "[t]he only alternative was to submit
> to an illegal exaction or discontinue its business," the

> payment of money "under such pressure[ ] has never been
> regarded as a voluntary act."

*Quality Built Homes II*, 371 N.C. at 75.

¶ 47        Admittedly, neither *Lanvale Properties* nor *Quality Built Homes II* addressed a Takings Clause claim or referenced *Koontz* and *Lanvale Properties* antedates *Koontz*. Nevertheless, this Court expressed concern in both of these decisions that local governments might use impact fee ordinances to force landowners to choose between paying a monetary exaction or forgoing development of their land entirely. The Court of Appeals recognized this concern in its discussion of *Dabbs* when it acknowledged that the Maryland case "is distinguishable from the present case" because, unlike the challenged "capacity use" fees, "the fees at issue [in *Dabbs*] were *not* 'a conditional monetary payment to obtain approval of an application for a permit of any particular kind,' " *Anderson Creek Partners*, 275 N.C. App. at 444 (quoting *Dabbs*, 458 Md. at 353), before observing that "[t]his distinction speaks directly to the types of coercive harms that the United States Supreme Court sought to prevent in *Koontz*" given that "the unconstitutional conditions doctrine seeks to prevent the government from leveraging its legitimate interest in mitigating harms by imposing '[e]xtortinate demands' which may 'pressure [a landowner] into voluntarily giving up property for which the Fifth Amendment would otherwise require just compensation,' " *id.* (quoting *Koontz*, 57 U.S. at 605–06). Even so, the Court of Appeals found this distinction to be immaterial on the grounds that,

> [r]egardless of whether the [f]ees were to be paid prior to
> or after [plaintiffs] began their projects, the fees were
> predetermined and are uniformly applied—not levied
> against [plaintiffs] on an *ad hoc* basis—and thus do not
> suggest any intent by the County to bend the will or twist
> the arm of [plaintiffs].

*Id.* We do not find this logic to be persuasive.

¶ 48        As an initial matter, the fact that the ordinance at issue in *Dabbs* did *not* condition the issuance of a permit upon the payment of the impact fee was the very reason that the Maryland Court of Appeals deemed *Koontz* to be inapplicable in that case. *See Dabbs*, 458 Md. at 353. Aside from this significant distinction, we note that conditioning permit approval upon a landowner's decision to relinquish a property right goes to the heart of the manner in which the "unconstitutional conditions" doctrine has been deemed to be applicable in the land use context and animated the concerns that led to the Supreme Court's decision in *Koontz*. *See* 570 U.S. at 605 (observing that, "[b]y conditioning a building permit on the owner's deeding over a public right-of-way, for example, the government can pressure an owner into voluntarily giving up property for which the Fifth Amendment would otherwise require just compensation"). Finally, the Court of Appeals' determination that, because the challenged "capacity use" fees were "predetermined" and "uniformly applied," they "do not suggest any intent by the County to bend the will or twist the arm of [plaintiffs]," *Anderson Creek Partners*, 275 N.C. App. at 444, overlooks the fact that the test enunciated in *Nollan* and *Dolan* is designed to address the *risk* that local

governments might use their permitting power to coerce landowners into relinquishing property, with the extent to which the local government actually attempted to engage in such conduct representing a separate issue going to the merits of the claim rather than the identity of the legal standard used to evaluate such claims. Although the trial court may very well conclude on remand from our decision in this case that the County's capacity use fees satisfy both the "essential nexus" and "rough proportionality" requirements and do not, for that reason, result in a "taking," such a determination is irrelevant to the resolution of the issue of whether the "essential nexus" and "rough proportionality" test must be satisfied in the first place. As a result, we cannot agree with the Court of Appeals' determination that *Dabbs* provides the appropriate framework for use in deciding this case.

¶ 49        Aside from its reliance upon *Dabbs*, the County directs our attention to what it claims to be "[t]he overwhelming weight of authority" that "non-discretionary, generally applicable fees are not subject to the unconstitutional conditions doctrine." A careful analysis of the decisions upon which the County relies in making this argument shows that most of them were decided prior to *Koontz*, do not address the lawfulness of land-use exactions, or both, leaving only decisions such as *Building Industries Association-Bay Area*, 289 F. Supp. 3d at 1057–08, *Douglass Properties II, LLC*, 16 Wash. App. 2d at 171, and *American Furniture Warehouse Co. v. Town of Gilbert*, 245 Ariz. 156 (Ct. App. 2018) (concluding that "*Koontz* did not hold that *Dolan*

applied to generally applicable legislative development fees" such as those used to develop traffic signal systems), to support the County's position. Aside from the fact that none of these decisions are binding on this Court, we are not persuaded by their reasoning or their interpretation of *Koontz*, which generally echo the arguments advanced by the County in its brief and strike us as inconsistent with existing North Carolina precedent relating to the validity of land use exactions and the logic upon which *Koontz* rests. As a result, we do not find these decisions persuasive as we attempt to understand the force and effect of the principles enunciated in *Koontz* as applied to the facts of this case.

In addition, we are not persuaded that the applicability of the test enunciated in *Nollan* and *Dolan* depends upon whether the challenged condition was imposed administratively or legislatively. As at least one member of the Supreme Court has recognized, the lower courts have reached differing conclusions with respect to this issue, which the Supreme Court has yet to address. *See Cal. Bldg. Indus. Ass'n v. City of San Jose*, 577 U.S. 1179 (2016) (Thomas, J., concurring in the denial of certiorari).[13] After carefully reviewing the relevant decisions, we agree with plaintiffs

---

[13] A number of courts have applied the test enunciated in *Nollan* and *Dolan* to generally applicable, legislatively imposed impact fees such as those at issue in this case, *see e.g., Beavercreek*, 89 Ohio St.3d at 128; *Curtis v. Town of S. Thomaston*, 1998 Me. 63 (1998); *N. Ill. Home Builders Ass'n, Inc.*, 165 Ill.2d at 28, while others have limited the applicability of that test to administratively imposed conditions, *see, e.g., St. Clair Cnty. Home Builders Ass'n v. City of Pell City*, 61 So.3d 992 (Ala. 2010); *Spinell Homes, Inc. v. Mun. of Anchorage*, 78 P.3d 692 (Alaska 2003); *Home Builders Ass'n of Cent. Ariz. V. City of Scottsdale*, 187 Ariz. 479 (1997).

that nothing in *Nollan*, *Dolan*, or *Koontz* supports a view that those decisions only apply in the context of "administrative" decisions,[14] with the Supreme Court having consistently described the "unconstitutional conditions" doctrine as "preventing the *government* from coercing people into giving up" a constitutional right rather than preventing a particular branch of government from acting in a particular manner. *Koontz*, 570 U.S. at 604 (emphasis added); *see also Dolan*, 512 U.S. at 385 (noting that "the *government* may not require a person to give up a constitutional right—here the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property") (emphasis added).

¶ 51     Admittedly, the fact that the challenged "capacity use" fees were imposed as the result of a legislative, rather than an administrative, process, may tend to suggest that those fees "more likely represent[ ] a carefully crafted determination of need tempered by the political and legislative process rather than a 'plan of extortion' directed at a particular landowner." *Curtis*, 1998 Me. 63, ¶ 7 (citing *Dolan*, 512 U.S.

---

[14] A number of courts have focused on language from *Dolan* distinguishing prior cases upholding the constitutionality of land use planning from the situation before the Court in that case because those prior decisions "involved essentially legislative determinations classifying entire areas of the city, whereas here the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel," 512 U.S. at 385. *See, e.g., St. Clair Cnty. Home Builders Ass'n*, 61 So.3d at 1007. However, those prior cases involved zoning power and general land-use regulations rather than impact fees. *See Agins v. City of Tiburon*, 447 U.S. 255 (1980), *abrogated by Lingle*, 544 U.S. at 528; *Village of Euclid*, 272 U.S. at 365; *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922).

at 387).  In light of that logic, the General Assembly's recent decision to enact the Public Water and Sewer System Development Act, S.L. 2017-138, 2017 N.C. Sess. Laws 996, which provides uniform guidelines for the implementation of water and sewer system development fees on a prospective basis, suggests that, in the future, such fees are likely to satisfy the "essential nexus" and "rough proportionality" requirement enunciated in *Nollan* and *Dolan*.  Even so, as a constitutional matter, we believe that a decision to limit the applicability of the test set out in *Nollan* and *Dolan* to administratively determined land-use exactions would undermine the purpose and function of the "unconstitutional conditions" doctrine.  *See* James Burling & Graham Owen, *The Implications of* Lingle *on Inclusionary Zoning and other Legislative and Monetary Exactions*, 28 Stan. Envtl. L. J., 397, 438 (2009) (observing that "[g]iving greater leeway to conditions imposed by the legislative branch is inconsistent with the theoretical justifications for the doctrine because those justifications are concerned with questions of the exercise [of] government power and not the specific source of that power"); David L. Callies, *Regulatory Takings and the Supreme Court: How Perspectives on Property Rights Have Changed from* Penn Central *to* Dolan*, and What State and Federal Courts Are Doing About It*, 28 Stetson L. Rev. 523, 567–68 (1999) (finding "little doctrinal basis beyond blind deference to legislative decisions to limit [the application of the test enunciated in *Nollan* and *Dolan*] only to administrative or quasi-judicial acts of government

regulators"); *see also Town of Flower Mound v. Stafford Ests. Ltd. P'ship*, 135 S.W.3d 620, 641 (Tex. 2004) (expressing skepticism that "a workable distinction can always be drawn between actions denominated adjudicative and legislative" and noting that the conditions under consideration in both *Nollan* and *Dolan* were imposed pursuant to authority granted by state law). At the end of the day, we conclude that the applicability of the test enunciated in *Nollan* and *Dolan* hinges upon the fact that the government has demanded property from a land-use permit applicant, either through a dedication of land or the payment of money, as a pre-condition for permit approval rather than the identity of the governmental actor that imposed the challenged condition. *See Koontz*, 570 U.S. at 619.

¶ 52       We are equally unpersuaded by the County's contention that plaintiffs "never identified a constitutional right that they were coerced into giving up" or "allege[d] coercion of any kind. According to their complaint, plaintiffs' claim rests upon a contention that, in accordance with *Koontz*, "[m]onetary exactions by a local government as a condition to development approval, plat approval, permit approval, and/or approval of construction, which are designed to offset the impact of a proposed development phase, must bear an essential nexus or rough proportionality to the impact that the development will have on existing infrastructure." In this case, payment of the challenged "capacity use" fees is not just a requirement to ensure that adequate water and sewer capacity is available to for plaintiffs' developments, but

also a precondition for the County's support for the issuance of a water and sewer permit from the Department of Environmental Quality. For that reason, we have little difficulty in concluding that plaintiffs have contended that the County violated the "unconstitutional conditions" doctrine set out in *Koontz*, *Dolan*, and *Nollan*, which rests upon the Fifth Amendment right to be free from governmental takings of one's property without just compensation. *See Koontz*, 570 U.S. at 605.

¶ 53        Similarly, the County's decision to condition its support for the issuance of the required water and sewer permits upon the payment of the challenged "capacity use" fees is inherently coercive in the constitutional sense. *See id.* at 614 (recognizing that the "central concern" underlying *Nollan* and *Dolan* was "the risk that the government may use its substantial power and discretion in land-use permitting to pursue governmental ends that lack an essential nexus and rough proportionality to the effects of the proposed new use of the specific property at issue"). The County's contention that it had not engaged in any coercive conduct in this instance because "[plaintiffs] *wanted* to connect to the County's water and sewer system" and "could have used their properties for other purposes" or "sought to develop properties that used well water and septic tanks" is not persuasive for several reasons.

¶ 54        As an initial matter, we note that the payment of the challenged "capacity use" fees was not just necessary to permit the landowner to connect to the County's water and sewer system; instead, as we have already explained, the making of those

payments implicated plaintiff's ability to develop their property at all given that plaintiffs were required to pay the challenged "capacity use" fees before the County would support plaintiffs' applications for the issuance of a water and sewer permit, with the issuance of such a permit constituting a necessary precondition for the recording of a residential subdivision plot.  In other words, as a practical matter, plaintiffs would have been unable to proceed with their development plans had they refused to make the necessary "capacity use" fee payments to the County, a situation that places them squarely within the ambit of *Nollan*, *Dolan*, and *Koontz*.  In the same vein, the fact that plaintiffs "could have used their properties for some other purposes" would have been equally true of the plaintiffs in each of the other relevant Supreme Court land-use exactions cases, with none of those cases having held that the availability of alternative uses for the plaintiff's property sufficed to justify an otherwise unconstitutional land-use exaction.[15]

---

[15] This argument might be relevant to a contention that the County's ordinance amounts to a "regulatory taking," in which government action violates the Takings Clause because it "denies [a landowner] all economically beneficial or productive use of [his or her] land."  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992).  Plaintiffs have not advanced any sort of "regulatory taking" claim in this case and we do not believe the facts would support such a claim.  The imposition of the challenged "capacity use" fee at issue in this case is simply not a regulation of the type discussed by the Supreme Court in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), which held that a New York City law placing restrictions upon development activities involving individual historic landmarks was not an unconstitutional regulatory taking but was, instead, a valid exercise of the City's police power.  *See Lingle*, 544 U.S. at 528 (noting that cases involving "the special context of land-use exactions" are governed by *Nollan* and *Dolan*, rather than *Penn Central*); *see also Lanvale Properties*, 366 N.C. at 160 (holding that an ordinance requiring residential

¶ 55         Similarly, we are not persuaded by the County's argument that plaintiffs'

concerns should be directed to the legislative, rather than the judicial, branch.  To be

sure, the Supreme Court of California has opined that,

> [w]hile legislatively mandated fees do present some danger
> of improper leveraging, such generally applicable
> legislation is subject to the ordinary restraints of the
> democratic political process.  A city council that charged
> extortionate fees for all property development,
> unjustifiable by mitigation needs, would likely face
> widespread and well-financed opposition at the next
> election.  Ad hoc individual monetary exactions deserve
> special judicial scrutiny mainly because, affecting fewer
> citizens and evading systematic assessment, they are more
> likely to escape such political controls.

*San Remo Hotel*, 27 Cal. 4th, 643 at 671.  On the other hand, the Texas Supreme

Court has rejected this view, stating that

> [w]hile we recognize that an ad hoc decision is more likely
> to constitute a taking than general legislation, we think it
> entirely possible that the government could "gang up" on
> particular groups to force exactions that a majority of
> constituents would not only tolerate but applaud, so long
> as burdens they would otherwise bear were shifted to
> others.

*Town of Flower Mound*, 135 S.W.3d at 641.  The view expressed by the Texas

Supreme Court echoes in our observation in *Lanvale Properties* that Cabarrus County

---

property developers to pay a fee to subsidize new school construction was a mechanism for
generating revenue, rather than a land-use regulation); *Durham Land Owners Ass'n v.
County of Durham*, 177 N.C. App. 629, 638 (concluding that Durham County lacked the
authority under its "zoning and general police powers" to impose a school impact fee), *disc.
rev. denied*, 360 N.C. 532 (2006)).

had an incentive to increase the impact fees that it charged because it "could generate significant amounts of revenue from a possibly unpopular group—residential developers[.]" 366 N.C. at 162. *See also* Ronald H. Rosenberg, *The Changing Culture of American Land Use Regulation: Paying for Growth with Impact Fees*, 59 SMU L. Rev. 177, 262 (2006) (observing that, "[w]ithout having to face the opposition of future residents who do not currently live or vote in the locality, [local government] officials find impact fees an irresistible policy option" with "continuing political support").

As we have already noted, the Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). Consistent with this logic, to the extent that the challenged "capacity use" fees at issue in this case are intended to cover the cost of expanding the County's water and sewer systems to accommodate the developments in which plaintiffs were involved, then plaintiffs, rather than the public at large (who already support the existing system through the payment of user fees and, perhaps, taxes), can appropriately be made to bear those costs to the extent that they are "roughly proportional" to the impact of the proposed developments upon the County's water and sewer system.[16] As the Supreme Court recognized in *Koontz*, its own

---

[16] In other words, the issue before us is not whether the County may charge developers for the cost that the County may incur to expand its water and sewer capacity in order to serve the new customers that will result from successful development activities. The County

precedents "enable permitting authorities to insist that applicants bear the full cost of their proposals," with "[i]nsisting that landowners internalize the negative externalities of their conduct [being] a hallmark of responsible land-use management[.]" 570 U.S. at 605–06. Acceptance of this logic does not mean, however, that the courts have no role to play in analyzing the lawfulness of such exactions, since a state or local government's ability to require property owners to internalize the cost of development does not allow such governmental entities to "engag[e] in 'out-and-out . . . extortion' that would thwart the Fifth Amendment right to just compensation." *Id.* at 606 (quoting *Dolan*, 512 U.S. at 387). *See also Lucas*, 505 U.S. at 1014 (warning that, if "the uses of private property were subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed]' ") (alterations in original) (quoting *Mahon*, 260 U.S. at 415).

A number of the arguments that the County has advanced in this case rest upon an erroneous belief that the challenged "capacity use" fees are "user fees" rather than "impact fees." Nothing in the logic of the decision that we believe to be

---

may clearly do so if it has the necessary statutory authority, an issue which the Court of Appeals resolved in the affirmative and which is not before us for further review in this appeal, and if the fees in question satisfy the test enunciated in *Nollan*, *Dolan*, and *Koontz*. To be clear, if the impact fees like those at issue in this case have an "essential nexus" and are "roughly proportional" to the costs that the developers' activities will impose upon the County's water and sewer system, then no taking will have occurred. However, for the reasons set forth in elsewhere in this opinion, we cannot assume that this test will be satisfied based on the present record and must leave that issue for resolution by the trial court.

appropriate in this case will "subject every fee payment to a governmental entity to the *Nollan/Dolan/Koontz* analysis" or "cripple the ability of governments to tax, mandate fees, and levy other types of monetary payments that finance and make possible the services that governments provide."[17]   On the contrary, the logic underlying our decision in this case is limited to "impact fees" or "monetary exactions" and does not extend to true user fees such as charges for garbage collection, charges for the provision of actual water or sewer service or the right to tap on to existing water or sewer infrastructure, or fees assessed to cover the cost of enforcing particular regulatory regimes, so that our holding in this case should not be construed as inconsistent with anything that we said in *Homebuilders Association of Charlotte*. *See* 336 N.C. at 42 (discussing the relationship between regulatory authority and fees).  In addition, we are confident that the definitions of "impact fee" and "exaction" set out earlier in this opinion will provide the trial courts with the ability to

---

[17] Amici North Carolina Water Quality Association and National Association of Clean Water Agencies separately argue that application of the "unconstitutional conditions" doctrine to impact fees like those at issue in this case would be "an unnecessary and costly exercise" because the Public Water and Sewer System Development Fee Act "now expressly requires that impact fees be tied to the actual capital cost impacts to water and sewer systems imposed by new development, thereby ensuring that fees will exhibit a rational relationship to the costs imposed." *See* S.L. 2017-138, 2017 N.C. Sess. Laws 996.  In the event that the analysis outlined by amici is now statutorily required, we fail to see how a requirement that an impact fee satisfy the "essential nexus" and "rough proportionality" test enunciated in *Nollan* and *Dolan* would impose any additional burden upon any unit of local government and that this requirement would serve, instead, to ensure that any properly established impact fee satisfies the relevant constitutional standard.

distinguish between different types of payments required by local governments in future proceedings.

¶ 58        The County further contends that, even if *Koontz* is applicable in this case, plaintiffs have failed to allege sufficient facts to support the legal conclusion set out in their complaint that the challenged "capacity use" fees lacked an "essential nexus" and "rough proportionality" to the County's goal of mitigating the impact on existing water and sewer infrastructure. Aside from the fact that the *County*, not plaintiffs, has the burden of showing that the challenged "capacity use" fees satisfy the "essential nexus" and "rough proportionality" test, *see F.P. Dev., LLC v. Charter Twp. of Canton, Mich.*, 16 F.4th 198, 206 (6th Cir. 2021) (noting that the township had "fail[ed] to carry its burden to show that it made the required individualized determination" that "the required dedication is related both in nature and extent to the impact of the proposed development") (citing *Dolan*, 512 U.S. at 391), we note that, while the entry of judgment on the pleadings is appropriate in situations in which the plaintiff alleges facts that defeat his, her, or its legal theory, *DiCesare*, 376 N.C. at 98–99, no such situation exists in this case.

¶ 59        Admittedly, plaintiffs' allegation that "the water and sewer impact fees are collected by the County to pay for the costs of future improvements to the County's water and sewer system" suffices to defeat any argument that the challenged "capacity use" fees lack an "essential nexus" to the County's objective of properly

funding the expansion of its water and sewer system capacity. However, plaintiffs' complaint does not, as the County claims, "confirm[ ] that the fees are roughly proportional to the costs of the expansion." Instead, plaintiffs' complaint simply identifies the rates at which "capacity use" fees for water and sewer service are currently set and alleges that "[t]he water and sewer impact fees for commercial development is an amount determined by the County based upon the estimated water and sewer usage of the property." As a result, while plaintiffs' complaint admits that the challenged "capacity use" fees are based upon what the County estimates to be the cost of expanding existing water and sewer capacity to serve the properties contained in plaintiffs' development, it *does not* concede that these estimates accurately reflect the impact of plaintiffs' proposed developments upon the County's water and sewer systems. Although "[n]o mathematical calculation is required," the County must still show that its estimates are "roughly proportional" to the actual cost of expanding the County's water and sewer system to accommodate plaintiffs' proposed developments, *see Dolan*, 512 U.S. at 391, with the County having provided no support for its assertions that "rough proportionality" inquiry is simply "one of common sense" or that the challenged "capacity use" fees "meet that common-sense test and do not require a further factual inquiry." As a result, whether the challenged "capacity use" fees are or are not "roughly proportional" to the costs that plaintiffs'

developments impose upon the County's water and sewer infrastructure is an issue that must be determined on remand.

¶ 60 Finally, despite our acceptance of the plaintiffs' underlying legal theory, we agree with the County that it would be improper for plaintiffs to recover the "capacity use" fees that they have already paid in the event that plaintiffs have passed those costs along to others, such as ultimate purchasers, in order to ensure that no party receives a "windfall." For that reason, we hold that, on remand, the County shall be permitted to present evidence concerning the extent to which, if at all, plaintiffs factored the cost of the challenged "capacity use" fees into the prices at which they have sold lots to ultimate purchasers. In the event that the trial court finds that plaintiffs have done so, it shall be permitted to hear evidence regarding the appropriate manner by which any such amount should be distributed to the parties in order to ensure that no party receives a windfall as a result of these proceedings.

**E. Mootness**

¶ 61 In the alternative, the County requests that this Court dismiss plaintiffs' petition for discretionary review as improvidently allowed on the grounds that the issues that are before the Court have become moot. According to the County, "[plaintiffs'] *Koontz* theory appears in the complaint's complaint for declaratory relief," but "[plaintiffs] no longer have a justiciable claim for a declaration because a declaration about the validity of the old ordinance would not prospectively redress

any injury that [plaintiffs] claim[ed] to have suffered." In addition, the County argues that plaintiffs have not sought "money damages—retrospective relief—on their *Koontz* theory" and have "only sought money damages [for] claims that are not before this Court." As a result, in the County's view, plaintiffs' request for declaratory relief has been rendered moot given that the relevant statutory provisions have been amended during the pendency of this case, citing *Cape Fear River Watch v. N.C. Env't Mgmt. Comm'n*, 368 N.C. 92, 98 (2015) (holding that the enactment of new legislation by the General Assembly rendered the trial court's declaratory ruling moot because it superseded the administrative agency rule challenged in the case).

¶ 62        In support of this contention, the County argues that, after plaintiffs had filed their complaints, the General Assembly passed the Public Water and Sewer Development Fee Act, which outlines the process by which local governments are entitled to calculate and assess "system development fees." *See* S.L. 2017-138, 2017 N.C. Sess. Laws 996. The County claims that it has assessed water and sewer system development fees in accordance with these newly enacted statutory provisions since 2017 and that current law "allows the County to impose much higher fees than what [plaintiffs] paid and contest[ed] here." As a result, the County contends that, "even if this Court were to side with [plaintiffs] on their constitutional contentions, that would not affect [plaintiffs'] legal rights going forward."

¶ 63        A careful analysis of plaintiffs' complaints clearly shows that plaintiffs are seeking both a declaration that the challenged "capacity use" fees are unlawful *and* a return of "all water and sewer impact fees paid to the County as damages," along with prejudgment interest, pursuant to former N.C.G.S. § 153A-324, with plaintiffs' request for monetary damages appearing in its claim pursuant to N.C. Const. art. I, § 19, and their contention that the challenged "capacity use" fees lack the required "essential nexus" and "rough proportionality" appearing in its request for declaratory relief.  In our view, the fact that these allegations appear in separate portions of plaintiffs' complaint does not suffice to support the County's mootness argument given that plaintiffs' claim for monetary relief expressly "reincorporate[s] by reference as if fully set forth herein" all of the earlier allegations set out in the complaint, including those referencing *Koontz*, and given that N.C. Const. art. I, § 19 contains an implicit prohibition against the taking of property without just compensation, *Finch v. City of Durham*, 325 N.C. 352, 362–63 (1989) (citing *Long v. City of Charlotte*, 306 N.C. 187, 196 (1982)), which is the same constitutional right that underlies *Nollan*, *Dolan*, and *Koontz*.  As a result, since plaintiffs' claim for monetary relief is inextricably intertwined with their request for declaratory relief based upon *Koontz*, we are unable to agree with the County that the claims that are before us in this case have been rendered moot.

¶ 64　　As further support for our determination with respect to the mootness issue, we conclude that the passage of the Public Water and Sewer Development Fee Act, while relevant to the validity of any challenge to the County's *statutory* authority to enact "capacity use" fees like those at issue here, has no bearing on the constitutionality of those fees. "A constitutional prohibition against taking or damaging private property for public use without just compensation is self-executing and neither requires any law for its enforcement, nor is susceptible of impairment by legislation." *Sale v. State Highway & Pub. Works Comm'n*, 242 N.C. 612, 617 (1955) (citations omitted). As a result, even if plaintiffs had sought nothing more than a declaration that the "capacity use" fees at issue in this case are unconstitutional under *Koontz*, the enactment of the 2017 legislation does not have the effect of rendering any constitutional claim that plaintiffs may have asserted moot.

**F. Demonstration of an Issue of Material Fact**

¶ 65　　Finally, plaintiffs argue that the trial erred by entering judgment on the pleadings in the County's favor because the pleadings demonstrate the existence of a genuine issue of material fact concerning the extent to which the challenged "capacity use" fees, as applied to plaintiffs, had an "essential nexus" and "rough proportionality" to the anticipated impact that plaintiffs' proposed developments would have on the County's water and sewer infrastructure. Although plaintiffs have not advanced any specific argument with respect to this issue in their brief, a careful

examination of the pleadings does tend to show, as we have already noted, that, while there is no genuine issue of material fact concerning the extent to which the challenged "capacity use" fees had an "essential nexus" to the impact of plaintiffs' development upon the County's water and sewer systems, the parties clearly dispute the extent to which relevant fees were "roughly proportional" to the actual impact on the County's water and sewer systems. As a result, on remand, the parties shall be permitted to conduct discovery and present evidence concerning the issue of whether the challenged "capacity use" fees satisfy the "rough proportionality" component of the *Nollan/Dolan* test. In the event that the amount of the "capacity use" fees that the County has assessed is no more than is "roughly proportional" to the additional costs that the County will incur in providing the facilities needed to ensure the availability of adequate water and sewer services for plaintiffs' developments, then no taking should be found to have occurred. In addition, as we have already discussed, if the trial court determines that the challenged "capacity use" fees are not "roughly proportional" to the impact of plaintiffs' proposed developments upon the County's water and sewer systems, the parties shall be permitted to present evidence regarding the extent to which, if at all, plaintiffs have passed the "capacity use" fees they have already paid to ultimate purchasers and the manner in which any such amount should be distributed in order to ensure that no person receives a "windfall."

### III.    Conclusion

¶ 66        Thus, for the reasons set forth above, we hold that the "capacity use" fees at issue in this case are "monetary exactions" subject to constitutional scrutiny under *Koontz* and must, therefore, satisfy the "essential nexus" and "rough proportionality" test in order to avoid being treated as takings of plaintiffs' property. As a result, the decision of the Court of Appeals is reversed and this case is remanded to the Court of Appeals for further remand to Superior Court, Harnett County, for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Justice BERGER concurring in part and dissenting in part

¶ 67        I join in the majority opinion generally. However, if an unconstitutional taking occurred, there is no scenario in which the county can retain the fees collected. The county should not profit from its taking, and I respectfully dissent from that portion of the opinion.

¶ 68        I write separately because "[a] frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty." N.C. Const. art. I, § 35.

> The admonition of the Constitution requiring frequent recurrence to fundamental principles is politically sound. . . . We violate no precedent in referring to the important

> function these guaranties of personal liberty perform in determining the form and character of our Government. . . . If those whose duty it is to uphold tradition falter in the task, these guaranties may be defeated temporarily, or permanently lost through obsolescence.

*State v. Harris*, 216 N.C. 746, 762–63, 6 S.E.2d 854, 865–66 (1940).

¶ 69 State constitutional provisions often provide greater protections for our rights, liberties, and freedoms than those secured by the Constitution of the United States. *State v. Jackson*, 348 N.C. 644, 648, 503 S.E.2d 74, 91 (1998). This Court has recognized that

> [o]ur Constitution is more detailed and specific than the federal Constitution in the protection of the rights of its citizens. We give our Constitution a liberal interpretation in favor of its citizens with respect to those provisions which were designed to safeguard the liberty and security of the citizens in regard to both person and property.

*Corum v. University of North Carolina*, 330 N.C. 761, 783, 413 S.E.2d 276, 290 (1992) (cleaned up).

¶ 70 Our Declaration of Rights begins with the foundational statement that "[w]e hold it to be self-evident that all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness." N.C. Const. art. I, § 1. The "fundamental guaranties" of Article I, section 1 are "very broad in scope." *State v. Ballance*, 229 N.C. 764, 769, 51 S.E.2d 731, 734 (1949). "This Court's duty to protect fundamental rights includes preventing arbitrary government actions

that interfere with" these fundamental rights. *King v. Town of Chapel Hill*, 367 N.C. 400, 408, 758 S.E.2d 364, 371 (2014) (citing N.C. Const. art. I, § 1).

¶ 71 The unconstitutional conditions doctrine and the Takings Clause of the Fifth Amendment provide protections from government exactions that require just compensation. *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 829, 107 S. Ct. 3141, 3144, 97 L. Ed. 2d 677 (1987); and *Dolan v. City of Tigard*, 512 U.S. 374, 378, 114 S. Ct. 2309, 2313, 129 L. Ed. 2d 304 (1994). *Nollan* and *Dolan* provide the constitutional floor. Although not argued by the parties, given our State's history of jealously guarding property rights, heightened scrutiny requiring such exactions be directly proportional to the projected impact may be available under the North Carolina Constitution.

Chief Justice NEWBY joins in this concurring in part and dissenting in part opinion.

Justice EARLS dissenting.

¶ 72 At its core, the unconstitutional conditions doctrine is about coercion: the doctrine "vindicates the Constitution's enumerated rights by preventing the

government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). The basic insight is that allowing governmental entities to impose conditions on the exercise of a constitutional right makes individuals vulnerable to potentially "extortionate demands." *Id.* at 619. In the land-use context, the doctrine has been applied to conditions that require a property owner to cede an interest in their property to the government—or to pay a "monetary exaction" in lieu of conveying a property interest—as a condition of obtaining the permits necessary to develop their property. When a government seeks to impose such a condition, there must be "an essential nexus and rough proportionality" between the condition and "the effects of the proposed new use of the specific property at issue." *Id.* at 614.

¶ 73        In this case, the majority concludes that Harnett County's imposition of a generally applicable impact fee that all property owners must pay if they wish to have the County's water and sewer infrastructure expanded to their property is a potentially "extortionate demand[ ]" that threatens the plaintiffs' rights under the Takings Clause. This conclusion rests on a mischaracterization of the County's actions and the choices presented to property owners in Harnett County. Specifically, the impact fee is not a monetary exaction subject to the unconstitutional conditions doctrine, requiring property owners who want the County to expand its water and sewer infrastructure to their property to offset a portion of the cost is not a taking,

and imposition of a generally applicable non-discretionary legislative fee is not coercive. The result is an unwarranted and unwise expansion of the scope of the Takings Clause that will engender frequent litigation and may ultimately diminish the capacity of municipalities to recoup fees to offset the costs of maintaining vital public infrastructure for the public's benefit. Even if this decision has few immediate practical consequences, it also signals an increased hostility towards government that hearkens back to a bygone era. Accordingly, I respectfully dissent.

## I.   The County's infrastructure fee is not equivalent to the "monetary exaction" at issue in *Koontz*

¶ 74      In *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994), the United States Supreme Court applied the unconstitutional conditions doctrine to ad hoc demands requiring property owners to cede an interest in their property as a prerequisite to obtaining a building permit. In *Koontz*, the Court applied the unconstitutional conditions doctrine for the first time to a government's demand for payment of a fee instead of a demand for an interest in property, or what the Court termed a "monetary exaction." 570 U.S. 595, 612 (2013) ("[S]o-called 'monetary exactions' must satisfy the nexus and rough proportionality requirements of *Nollan* and *Dolan*."). Specifically, the Court made subject to the doctrine a Florida municipality's requirement that, in order to obtain a building permit, a property owner needed either to (1) dedicate a "conservation easement," or (2) pay for the municipality to hire contractors to make improvements to property

owned by the municipality. *Id.* at 601–02. The majority holds that the infrastructure fee at issue in the present case is analogous to the monetary exaction at issue in *Koontz*.

¶ 75          There are obvious differences between the monetary exactions at issue in *Koontz* and the County's infrastructure fee. The most notable is the absence of a governmental demand for an interest in the developers' real property in this case. In *Koontz*, the Court recognized that a choice between dedicating an easement and being unable to develop property is not meaningfully different from the choice between dedicating an easement or paying money equivalent to the value of the easement and being unable to develop property. *See Koontz*, 570 U.S. at 612 (explaining that "a permitting authority wishing to exact an easement could simply give the owner a choice of either surrendering an easement or making a payment equal to the easement's value"). *Koontz* was primarily concerned with closing a perceived loophole arising under *Nollan* and *Dolan* whereby governments, cognizant that the unconstitutional conditions doctrine limited their authority to require conveyance of an actual interest in land as a condition of issuing a building permit, required payment of an equally valuable "monetary exaction" as a supposed alternative. *Id.* at 619. The municipality in *Koontz* was trying to do through the permitting process what would have been "a *per se* taking" if done "directly": seize land without providing just compensation. *Id.* at 612. *Koontz* affirmed that governments could not "evade the

limitations of *Nollan* and *Dolan* by recharacterizing the demand for an easement as a requirement for "payment equal to the easement's value." *Id.* By contrast, in this case, there is no demand for an interest in land lurking behind the County's requirement that the developers help defray the cost of the public service they wish to obtain.

¶ 76        Moreover, the exaction sought in *Koontz* was also not levied to offset the costs of any particular service the municipality was providing to the landowner; instead, the exaction was sought to mitigate the diffuse impacts of development on the municipality's water resources. *Id.* at 600–01. The landowner in *Koontz* did not obtain any specific service in exchange for the exaction; the exaction was merely the price of obtaining permission to build. *Id.* at 602. By contrast, in this case, the County has demanded that all of the developers pay a sum of money in order to offset the costs of providing a particular public service to the developers. As the majority recognizes, the fees are imposed to achieve the County's "objective of properly funding the expansion of its water and sewer system capacity." *Ante*, at ¶ 59. The County is asking all property owners who wish to obtain access to a service to bear part of the cost of expanding that service. That is not equivalent to the monetary exaction at issue in *Koontz*. Even if, as the majority asserts, the logic of the Court's decision in *Koontz* "encompassed a broader range of governmental demands for the payment of money as a precondition for the approval of a land-use permit" than the precise kind of

demand imposed by the municipality in that case, *ante*, at ¶ 42, *Koontz* does not justify the majority's characterization of the County's impact fee.

## II. Requiring developers to pay the infrastructure fee prior to expanding water and sewer infrastructure does not coerce them into ceding their constitutional rights

¶ 77        Even assuming that the fee at issue in this case is akin to the monetary exaction at issue in *Koontz*, application of the unconstitutional conditions doctrine is still improper for two additional reasons: First, the requirement that developers pay a fee to offset the costs of extending the County's existing water and sewer infrastructure to their property before the County extends its existing water and sewer infrastructure to their property does not threaten any enumerated rights provided under the Takings Clause of the United States Constitution. Second, fees that are imposed via legislation on a generally applicable, non-discretionary, and uniform basis do not give rise to a meaningful risk of coercion in the constitutional sense. Accordingly, the justifications for subjecting a monetary fee to the unconstitutional conditions doctrine are not present under the circumstances of this case.

### A. Requiring payment of the infrastructure fee does not coerce the developers into giving up a constitutional right

¶ 78        The unconstitutional conditions doctrine recognizes that when "someone refuses *to cede a constitutional right* in the face of coercive pressure, the

impermissible denial of a governmental benefit is a constitutionally cognizable injury." *Koontz*, 570 U.S. at 607 (emphasis added). As articulated in *Nollan*, *Dolan*, and *Koontz*, the doctrine applies when the government tries to do something by imposition of a permitting condition that would be a per se taking if done directly. *See id.* at 612 ("A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing. . . . [I]f the government had directly seized the easements it sought to obtain through the permitting process, it would have committed a *per se* taking."). The gravamen of an unconstitutional conditions claim is thus the existence of an underlying enumerated constitutional right that is threatened by the government's actions.

¶ 79      Here, the majority holds that the unconstitutional conditions doctrine applies to the circumstances of this case because the County's imposition of the infrastructure fee threatens the developers' enumerated constitutional rights under the Takings Clause. *See ante*, at ¶ 52. Under the Takings Clause, property owners have the "right to receive just compensation when [their] property is taken for a public use." *Dolan*, 512 U.S. at 385. "[T]he appropriation of an easement constitutes a physical taking." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2073 (2021). Thus, in both *Nollan* and *Dolan*, it was obvious what constitutional right the municipalities' conditions implicated: the government had conditioned approval of a building permit on the

property owner's conveyance of an easement on a portion of their property. *See Nollan*, 483 U.S. at 827 (addressing the question of whether "the California Coastal Commission could condition its grant of permission to [landowners to] rebuild their house on their transfer to the public of an easement across their beachfront property"); *Dolan*, 512 U.S. at 395 (considering whether a city could require dedication of a "floodplain easement" and a "pedestrian/bicycle pathway easement" as a condition of granting a building permit). The County's imposition of an infrastructure fee in this case obviously does not threaten a taking in the *Nollan* / *Dolan* sense.

Nonetheless, relying on *Koontz*, the majority concludes that imposition of the infrastructure fee implicates the developers' "Fifth Amendment right to be free from governmental takings of one's property without just compensation." *Ante*, at ¶ 52. However, *Koontz* does not support the conclusion that imposition of an impact fee connected to a specific service a government provides to a specific property owner is akin to a taking. The developers are not being coerced to give up any constitutional rights. If the developers refused to pay the infrastructure fee, the County would not provide the benefit of extending the County's water and sewer infrastructure to their property. The developers do not have a constitutional right to access the County's water and sewer infrastructure without contributing to the cost of its provision. *See, e.g., Massachusetts v. United States*, 435 U.S. 444, 462 (1978) ("A governmental

body has an obvious interest in making those who specifically benefit from its services pay the cost . . . ."). If the developers did not obtain access to the County's water and sewer infrastructure, the County would not sign off on its application for a permit that the developers need to build residential subdivisions. The developers also do not have a constitutional right to build residential subdivisions without complying with applicable regulations. *See, e.g.*, *Batch v. Town of Chapel Hill*, 326 N.C. 1, 13 (1990) (concluding that a developer's "failure to comply with [a municipal] ordinance is a sufficient basis to support the council's refusal to approve plaintiff's subdivision plan").

¶ 81          When Harnett County refuses to extend its water and sewer infrastructure to property owned by individuals who refuse to pay the infrastructure fee, the County is not "deny[ing] a benefit to a person because he [is] exercis[ing] a constitutional right." *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983). The developers have "not alleged a physical taking of any of [their] property" because "[r]equiring money to be spent is not a taking of property," *Atlas Corp. v. United States*, 895 F.2d 745, 756 (Fed. Cir. 1990), at least when the money was "charged as a fee for service or a tax," *Homebuilders Ass'n of Metro. Portland v. Tualatin Hills Park & Recreation Dist.*, 185 Or. App. 729, 740 (2003). The only thing the County is denying the developers is the benefit of a service they would prefer not to pay for. If that is a taking, then it is difficult to see why all user fees are not also monetary

exactions subject to the doctrine, notwithstanding the majority's assertion to the contrary: conceptually, "charges for garbage collection, charges for the provision of actual water or sewer service . . . or fees assessed to cover the cost of enforcing particular regulatory regimes," *ante*, at ¶ 57, are also fees imposed to mitigate the (fiscal) impacts of endeavoring to provide a specific public service to residents.

The majority suggests that the potential taking arises from depriving the developers of the opportunity to "proceed with their development plans," *ante*, at ¶ 54, specifically "the recording of a residential subdivision plot," *id.*, even if they have failed to offset the costs of a service the government provides them and, as a result, cannot comply with applicable building regulations. To begin with, this is really a complaint directed at the North Carolina Department of Environmental Quality based on its refusal to issue a building permit, not at Harnett County. Regardless, this type of claim—that a regulation precludes a property owner from developing their land in one particular way—does not threaten a per se taking as in *Nollan*, *Dolan*, and *Koontz*. Rather, it is a type of claim that fits neatly within the "regulatory takings" doctrine established in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). A regulation which limits a property owner's ability to develop their property but which does not "completely deprive an owner of 'all economically beneficial use' of her property," *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (cleaned up), may constitute a regulatory taking depending on (1) "[t]he economic

impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Central*, 438 U.S. at 124. Accordingly, "the appropriate test here is a *Penn Central* regulatory takings analysis." *Better Hous. for Long Beach v. Newsom*, 452 F. Supp. 3d 921, 933 (C.D. Cal. 2020); *see also Mead v. City of Cotati*, 389 F. App'x 637, 638–39 (9th Cir. 2010) ("A generally applicable development fee is not an adjudicative land-use exaction subject to the [*Nollan* and *Dolan*]. Instead, the proper framework for analyzing whether such a fee constitutes a taking is the fact-specific inquiry developed by the Supreme Court in [*Penn Central*].").

¶ 83        The choice presented to the developers in this case is not the same as the choice that was presented to the landowner in *Koontz*: it is not the choice between conveying an interest in their property or paying an equivalent fee and being denied permission to develop their property. Rather, the choice is between paying a portion of the costs of extending a public service that will enable the developers to develop their property in one particularly desired way and not paying for the service. Under *Koontz*, that is not the kind of choice that is subject to the unconstitutional conditions doctrine.

**B. Application of a non-discretionary, generally applicable, uniform legislative fee does not give rise to a meaningful risk of coercion**

¶ 84        The majority's decision to subject the County's infrastructure fee to the unconstitutional conditions doctrine overlooks another important distinction between

the requirements at issue in the Supreme Court's unconstitutional conditions cases and the requirement at issue here. In *Nollan*, *Dolan*, and *Koontz*, the challenged permit conditions were discretionary conditions imposed on an ad hoc basis by a governmental entity after a permit application had been submitted. By contrast, the County's infrastructure fee is imposed on a non-discretionary, generally applicable, and uniform basis. Notwithstanding the majority's tautological assertion that the County's infrastructure fee is "inherently coercive in the constitutional sense," *ante*, at ¶ 54, these features substantially diminish the risk of coercion arising from imposition of the infrastructure fee. The salient distinctions involve both the manner in which the fees are applied and the manner in which they are enacted.

¶ 85        In *Koontz*, the property owner challenged a condition devised by a water management district under a Florida statute that authorized the district to require developers to "offset . . . resulting environmental damage by creating, enhancing, or preserving wetlands elsewhere." 570 U.S. at 601. This kind of permitting process gives rise to a risk of coercion "because the government often has *broad discretion* to deny a permit that is worth far more than property it would like to take." *Id.* at 605 (emphasis added). For example, if developing the undeveloped land imposes costs to the municipality of $1,000, and issuing a building permit will enable the property owner to develop the land in a way that increases its value by $10,000,000, then the municipality has the power to demand a fee that far exceeds the costs of development

it will be forced to bear. This is the kind of coercive power the unconstitutional conditions doctrine attempts to mitigate. *Id.* ("So long as the building permit is more valuable than any just compensation the owner could hope to receive for the right-of-way, the owner is likely to accede to the government's demand, no matter how unreasonable."). Under this scenario, there is a significant risk that a municipality will "leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." *Id.* at 606.

As numerous other courts have recognized, the same risk of coercion is not present when the amount of a fee is fixed beforehand at a set amount for all property owners without regard for the potential value of their property. *See, e.g.*, *Knight v. Metro. Gov't of Nashville & Davidson Cnty.*, 572 F. Supp. 3d 428, 443 (M.D. Tenn. 2021) ("The *Nollan/Dolan* standard of review does not apply to generally applicable land use regulations, as opposed to adjudicative land-use exactions."); *Am. Furniture Warehouse Co. v. Town of Gilbert*, 245 Ariz. 156, 163 (Ct. App. 2018) ("*Koontz* addressed the constitutionality of a government's 'adjudicative decision' unique to a parcel. . . . *Koontz* did not hold that *Dolan* applied to generally applicable legislative development fees."); *Better Hous. for Long Beach v. Newsom*, 452 F. Supp. 3d at 932 ("*Koontz* itself involved an adjudicative, individual determination, and the majority never addressed *Nollan/Dolan's* application to general legislation. Instead, it repeatedly emphasized the special vulnerability of land use permit applicants to

extortionate demands for money." (cleaned up)); *Douglass Properties II, LLC v. City of Olympia*, 16 Wash. App. 2d 158, 164, *rev. denied*, 197 Wash. 2d 1018 (2021), *and cert. denied*, 142 S. Ct. 900 (2022) ("[T]he *Nollan/Dolan* test does not apply to the traffic impact fees, because such fees are legislatively prescribed generally applicable fees outside the scope of *Koontz*."); *Willie Pearl Burrell Tr. v. City of Kankakee*, 2016 IL App (3d) 150655, ¶ 44 ("Defendant's demand for money stems from . . . a generally applicable ordinance . . . [and] is thus not the sort of *ad hoc* demand contemplated in *Koontz*, but simple compliance with a straightforward ordinance."); *Dabbs v. Anne Arundel Cnty.*, 458 Md. 331, 353–54 (2018) ("This case falls squarely within *Dolan's* recognition that impact fees imposed on a generally applicable basis are not subject to a rough proportionality or nexus analysis."). The fees in this case "are predetermined, set out in [an] Ordinance, and non-negotiable; the Fees are not assessed on an ad hoc basis or dependent upon the landowner's particular project." *Anderson Creek*, 275 N.C. App. at 443. There is no opportunity for the government to assess the value of the permit to an individual property owner and adjust the demand for money accordingly. Instead, "[t]he legislatively-imposed development impact fee is predetermined . . . and applies to any person wishing to develop property in the [County]." *Dabbs*, 458 Md. at 353. There is a meaningful difference between the scenario at issue in this case and the circumstances of *Koontz*: It is the difference between a driver pulling up to a gas station where prices are listed prominently on

the pumps and a driver pulling up to a gas station where the attendant chooses a price after the driver asks for a certain amount of gas. In both cases, drivers might not be thrilled at the hit to their wallet, but only in the latter circumstance does the gas station attendant have the chance to levy an "extortionate demand[ ]" based on what kind of car the driver is driving and how important it is to the driver to arrive at his or her destination.

¶ 87        The majority concludes that this distinction in how fees are calculated is irrelevant, suggesting that even a legislature can choose to "exercise . . . government power" in a coercive manner. *Ante*, at ¶ 51. While it may be theoretically possible for a municipality to set predetermined impact fees at an amount totally incommensurate with the cost of providing a service, it is legally prohibited and practically unlikely. As noted above, the regulatory takings doctrine already restrains the capacity of governments to limit how property owners utilize their property; in addition, state law already precludes municipalities from assessing fees to defray the costs of public services that are "unreasonable." *Homebuilders Ass'n of Charlotte, Inc. v. City of Charlotte*, 336 N.C. 37, 46 (1994). Moreover, the developers have a meaningful opportunity to influence the enactment of legislative impact fees through participation in the political process. *See San Remo Hotel L.P. v. City And Cnty. of San Francisco*, 27 Cal. 4th 643, 671 (2002) ("[G]enerally applicable legislation is subject to the ordinary restraints of the democratic political process."). Quoting the

Texas Supreme Court, the majority opines that it is "entirely possible that the government could 'gang up' on particular groups to force exactions that a majority of constituents would not only tolerate but applaud." *Ante*, at ¶ 55. But "[l]egislation designed to promote the general welfare commonly burdens some more than others." *Penn Central*, 438 U.S. at 133. The developers have a right to participate in the process of enacting legislation, not to dictate the results of that process. Their concern that the result may not reflect their preferences is not the same as a complaint that they have been excluded from the political process in any constitutionally salient way.

## III.  Conclusion

Ultimately, the majority is correct in suggesting that its decision will have little practical effect, either on the parties to this case or on land-use law in North Carolina more generally. The majority opinion attempts to preclude the developers from collecting a "windfall" by recouping fees they passed on to ultimate purchasers, *ante*, at ¶ 61, and the majority notes that passage of the Public Water and Sewer System Development Act should mean that "in the future, such fees are likely to satisfy the 'essential nexus' and 'rough proportionality' requirement enunciated in *Nollan* and *Dolan*," *id.*, at ¶ 51. But the majority's decision to convert generally applicable legislative impact fees into monetary exactions subject to the unconstitutional conditions doctrine is not without consequence. Although the majority purports to limit application of the rule it has announced to "impact fees" as

distinct from the "true user fees" and taxes governments rely upon to fund their continued operations, *id.* at ¶ 57, the lines that separate these categories are blurry and, often, more semantic than essential. At a minimum, governments will need to expend more resources justifying the imposition of reasonable fees used to defray the costs of providing public services.[1]

¶ 89        More broadly, the majority's willingness to expand both the unconstitutional conditions doctrine and the Takings Clause to shield property owners from governmental efforts to recoup the costs of providing public services is a troubling throwback to an antiquated jurisprudence. The unconstitutional conditions doctrine is "a product of *Lochner*-like, pre-New Deal understandings" initially designed "to protect common law rights in the face of threats to those rights created by the rise of the regulatory state." Cass R. Sunstein, *Why the Unconstitutional Conditions Doctrine Is an Anachronism (with Particular Reference to Religion, Speech, and Abortion)*, 70 B.U. L. Rev. 593, 597 (1990). By constitutionalizing a property owner's objection to a democratically legitimate non-discriminatory policy choice, the majority risks conveying the message that certain constitutional rights asserted by certain litigants are most favored. The Court can dispel this notion in future cases by evenhandedly applying the unconstitutional conditions doctrine with the same

---

[1] Although we disagree with the majority that the unconstitutional conditions doctrine applies, we agree that, having determined that it does, on remand, it is appropriate for the trial court to consider whether ordering the developers to be refunded for prior infrastructure fees would provide them with a windfall.

solicitousness towards claims brought by other categories of litigants whose rights are allegedly burdened by onerous conditions imposed on their receipt of public benefits. *See* Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413, 1416 (1989) (describing how the unconstitutional conditions doctrine has also been applied "to protect personal liberties of speech, association, religion, and privacy just as it once had protected the economic liberties of foreign corporations and private truckers" in the *Lochner* era). Otherwise, we risk perpetuating an "inconsistent application" of a doctrine which "has never been an overarching principle of constitutional law that operates with equal force regardless of the nature of the rights and powers in question." *Dolan*, 512 U.S. at 407 n.12 (Stevens, J., dissenting). Accordingly, I respectfully dissent.

Justice HUDSON and Justice MORGAN join in this dissenting opinion.